*In re* MARRIAGE OF RANDOLPH B. WILEY, Petitioner-Appellant, and AMBER L. WILEY, Respondent-Appellee.

Fourth District   No. 4—89—0819

Opinion filed June 27, 1990.

Norman J. Fombelle and Kent A. Rathbun, both of Burger, Fombelle, Zachry & Rathbun, P.C., of Decatur, for appellant.

Frederick P. Erickson, of Erickson, Davis & Murphy, Ltd., of Decatur, for appellee.

PRESIDING JUSTICE KNECHT delivered the opinion of the court:

The petitioner, Randolph Wiley, appeals the judgment of dissolution, challenging (1) the award of joint custody insofar as it places primary physical custody with respondent Amber Wiley; and (2) the method the court used in awarding the marital residence to the respondent and his pension rights to him. We affirm.

Petitioner and respondent were married in 1978. Their children, C.T. and C.G., were born fraternal twins on April 17, 1988. Petitioner first challenges the custody award of the court by asserting the respondent has been guilty of negligence in her care of the twins.

Petitioner testified respondent allowed the babies to play with an allegedly dangerous music box, which respondent denied. Petitioner also testified he walked into the house and discovered the babies on the floor of one room while the respondent was in another room, brushing her hair, allegedly after taking a shower. On another occasion, petitioner discovered one of the children unattended in a child's bathtub in the sink, and he contends the child could have drowned; respondent contended she had gone to another room temporarily to get some of the children's clothes.

Petitioner's mother testified the respondent walked the children in a stroller on a hot day with the sun shining on them and a dog leashed to the stroller. She also testified to an incident at the doctor's office when one twin walked into another room while the respondent tied the other twin's shoe. The petitioner and his mother were also present in the doctor's office but did not prevent this from happening. She also testified respondent frequently would walk several feet away from the changing table while changing the baby in order to get something from another table and then return to the changing table. Much is made by the petitioner of respondent's admission she once allowed a baby to roll off the counter, catching him before he reached the floor. There were no witnesses to this incident, and respondent contends she was close enough to the counter so the baby rolled into her arms and never fell below the countertop.

The most serious allegations involve two occasions, admitted by the respondent, when she left the children in the playpen locked in the house while she went to the store for 15 minutes on one occasion, and to the post office for five minutes on the other. The respondent contended she ran to the store and back, an eight-block trip, while the

petitioner produced a witness who saw respondent walking, and to whom respondent showed the keys of the house and said the children were locked in the house.

On November 15, 1988, petitioner requested and received an order of protection enjoining the respondent from beating, striking, threatening, or interfering with the personal liberty of the children, although it is undisputed respondent never physically abused the children in the ways described in the order. Also on this date, petitioner filed for temporary custody, which was later granted. On August 31, 1989, petitioner filed for and was granted another order of protection against the respondent.

Testimony from the petitioner's sister and baby-sitter portray the respondent as a passive, distracted, out-of-touch, nervous individual. Neither of these witnesses testified respondent was physically or verbally abusive or violent. Instead, testimony from these witnesses indicated respondent was a kind person who loved her children. Ron Little, counselor at the Caring Center, testified on behalf of petitioner. He had five sessions with both petitioner and respondent, and six later sessions with only the respondent. He found respondent to have a passive personality, but found both parties stable enough to be parents. A test given to both petitioner and respondent indicated petitioner had normal results while respondent tried to answer questions so as to make a more favorable impression on the tester. Little testified petitioner was a critical and demanding person; Little was concerned this would transfer to petitioner's behavior toward the children. In Little's assessment, respondent would provide the best warmth and caring for the children, and the previously described incidents were bad judgment, not a sign of instability.

Petitioner testified about an incident involving one child having runny stools, for which he saw no need to see a doctor. When respondent took the child to the doctor during a visitation, she obtained medicine for diarrhea. The petitioner alleges respondent gave both children the medicine, as indicated by (1) the large amount of medicine allegedly missing from the bottle, and (2) the other child's alleged constipation following the incident. The petitioner also testified to respondent taking one of the children to get an ear examination during another visitation, at which time the doctor mislabeled the medicine, putting the wrong twin's name on the bottle. He also testified on one occasion the respondent, while carrying a baby to the car in a car seat, placed the baby and the seat on the ground to chase their dog.

Respondent presented the following testimony. Her friends, Theresa Glick and her husband Roy, a Decatur policeman, testified

while it may have been a mistake to leave the children in the house unattended, this was a mistake in judgment and a result of inexperience. They further testified respondent was a loving parent, close to the children, and they trust their own daughter to respondent's care. Respondent's sister testified respondent had a close relationship with her children, showed them love and patience, and spent much time and energy with them in a variety of activities. The client service director for a support group testified respondent had taken eight months of her parenting-skills class and is a sound and competent person and a good parent. A counselor for another parenting class attended by the respondent testified respondent is a very caring person and the proper person for custody. Respondent's mother testified respondent gives the children excellent care, they love her very much, and they do not want to be out of her sight at any time.

During the hearing, testimony indicated verbal and physical abuse between the parents. Petitioner initially testified respondent was abusive and threatening at various times, starting all the fights. Petitioner later testified respondent started only half the fights. With the exception of an openhanded slap on the arm witnessed by respondent's mother, there was no other evidence of any abusive behavior by the respondent. Rather, all the evidence indicated she was a passive, gentle, kind, and calm person. On the other hand, testimony from respondent's witnesses and from petitioner himself corroborated much of respondent's testimony regarding petitioner's physical and verbal abusiveness toward her. For example, petitioner complained about an incident wherein respondent continued to rock and read to one of the babies who was fussing prior to bedtime. In petitioner's opinion, the baby simply had to be put to bed and left alone. Petitioner admitted that after about 45 minutes he "rapped" respondent on the head while she had the baby in her arms; he then took the baby from her, and placed him in bed, at which time the child went immediately to sleep.

Respondent's mother testified she noticed bruises on the respondent. She also testified to petitioner's admission he had hit respondent three times while she was pregnant. Respondent contended, and petitioner denied, petitioner physically threw her out of the house on each of two previous separations; and, once he found out about the most recent temporary custody decision, he put some of her clothes in a cardboard box, refusing to let her take any luggage, and ordered her out of the house within the hour.

Respondent testified petitioner was constantly critical of her. It is uncontradicted petitioner actively discouraged her from sending any

greeting cards, or from seeing her family or friends while he was home. Petitioner controlled her spending of money, telling her how much to spend and what to buy, and checking receipts after she returned from shopping. Respondent testified petitioner would hold a pillow over her face to scare her into having sex; petitioner denied holding the pillow down on respondent's face, but admitted holding it over her face. Respondent also testified petitioner would send her to the basement when he thought she did something wrong.

Petitioner's abusive nature was further testified to by Officer Stenger of the Mount Zion police force, who was called to the house on several occasions. Once, petitioner called the police when respondent attempted to take the children for a visitation. Petitioner contended respondent's car seats were too small, but refused to allow respondent to use his car seats. On this occasion, the officer testified petitioner's attitude was abusive, and petitioner called him "Officer Bubba." Petitioner contended he called the officer this because the officer refused to identify himself by name; the officer testified he was wearing his name badge at the time. The officer also testified petitioner constantly interrupted his interview with the respondent, while the respondent was calm at all times and did not interrupt.

The second call to the police involved the incident previously referred to when the doctor mislabeled the prescription. This time, petitioner yelled at the police officer when he thought the officer had ordered him to give the medicine to the child. The policeman testified he merely suggested the prescription was probably fine, since the doctor had only examined one of the children and the prescription was obviously meant for the child examined, though the other child's name appeared on the label. The officer also testified petitioner wanted him to arrest both his wife and the doctor who wrote the prescription. When the policeman told him he did not think there was sufficient probable cause for arrest of respondent, petitioner told him it was not up to him to think. Respondent's mother, present during this incident, contends petitioner accused both her and her daughter of attempting to poison the children.

In the judgment of dissolution, the court recognized respondent was primary caretaker of the twins after they were first born, but she left the children unattended on two occasions without giving the court a reasonable explanation for this conduct. The court rejected testimony that the children were in any reasonable apprehension of harm when, for example, respondent bathed them and, on such occasions, the respondent was away from them for only a brief period of time and distance. The court found credible respondent's testimony about

petitioner striking, kicking, criticizing, and cursing her frequently; about petitioner controlling who she could speak to and how she spent her money; of petitioner sending her to the basement when he thought she did something wrong; and ridiculing her body and intelligence. The court found the petitioner was essentially a dictator in their home, and this behavior could be exhibited toward the children in the future. Therefore, based on the best interests of the children, the court awarded joint custody, but gave the primary physical custody to the respondent subject to reasonable visitation.

■ "[T]he trial court's determination of custody will not be reversed unless there has been a clear abuse of discretion or the decision was contrary to the manifest weight of the evidence." (*Brandt v. Brandt* (1981), 99 Ill. App. 3d 1089, 1099-1100, 425 N.E.2d 1251, 1259.) The trial court has broad discretion in matters of custody. (*Roth v. Roth* (1977), 52 Ill. App. 3d 220, 225, 367 N.E.2d 442, 447.) "The primary and paramount consideration in a child custody case is the best interest and welfare of the child." (*In re Marriage of Benevento* (1983), 118 Ill. App. 3d 16, 19, 454 N.E.2d 766, 768.) The relevant factors for such a determination are listed in the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1987, ch. 40, par. 602).

In this case, the court heard the testimony of alleged negligent behavior by the respondent, and testimony on petitioner's verbal and physical abuse of respondent. Respondent's testimony on petitioner's abusive behavior was consistent with testimony of two impartial witnesses, Little and Officer Stenger. Witnesses from both sides attested to respondent's passive nature, but acknowledged she was a kind, loving, and patient person toward her children. Two witnesses testified they trusted respondent with their daughter.

There was testimony as to respondent successfully attending parenting classes, one of which lasted up to eight months. Petitioner's attorney, in argument, contended that by attending not only one but two parenting classes, "she paraded her children" for the benefit of the court. Petitioner presented no evidence such activities were anything more than an attempt to overcome her acknowledged weaknesses as a parent out of consideration for the well-being of her children.

There is also no evidence of physical abuse of the children while in the care and custody of the mother, making this case distinguishable from *In re Marriage of Cotton* (1984), 103 Ill. 2d 346, 469 N.E.2d 1077, relied on by the petitioner. Petitioner contends the baby-sitter's assessment of the babies' passive behavior toward the respondent is

evidence of the children's preference for their father. This assessment ignores the witnesses who testified on how well the children and respondent relate to each other. The trial court had the best opportunity to observe the witnesses and the parties, and to assess their temperaments and personalities. *Benevento*, 118 Ill. App. 3d 16, 454 N.E.2d 766.

The petitioner contends his alleged conduct toward his former wife should not be considered in the custody determination since (1) there is no evidence of direct abuse of the children, and (2) "the court is not to consider conduct of a present or proposed custodian that does not affect his relationship with the child." (*In re Marriage of Rizzo* (1981), 95 Ill. App. 3d 636, 647, 420 N.E.2d 555, 563.) The Rizzo court also stated such conduct was a relevant area of inquiry if shown to affect the relationship with the children. (*Rizzo*, 95 Ill. App. 3d at 641, 420 N.E.2d at 559.) *Rizzo* is distinguishable on its facts, as it concerned a custodial parent's involvement with drugs and alcohol, while this case involves petitioner's verbal and physical abuse of the respondent.

■ By statute, the court may consider the physical violence or threat of such, by the child's potential custodian, whether directed against the child or another person. (Ill. Rev. Stat. 1987, ch. 40, par. 602(a)(6).) The statutory provision has been amended to eliminate the phrase "but witnessed by the child." (Ill. Rev. Stat. 1985, ch. 40, par. 602(a)(6).) In *In re Custody of Williams* (1982), 104 Ill. App. 3d 16, 432 N.E.2d 375, the court held such violence or threat thereof may be considered as a relevant factor in determining the best interests of the child, and "the best interests of the child may necessitate removing the child from [such a] potentially harmful environment irrespective of the child's state of knowledge." *Williams*, 104 Ill. App. 3d at 19, 432 N.E.2d at 377.

■ Further, in *In re A.D.R.* (1989), 186 Ill. App. 3d 386, 542 N.E.2d 487, this court upheld a finding of neglect which was the result of physical abuse of the mother by the father, rather than of abuse of the minor. This court held, "it is not unreasonable for a trial judge to conclude continuing physical abuse by one parent to another will cause emotional damage to a child and thus constitute neglect." (*A.D.R.*, 186 Ill. App. 3d at 393, 542 N.E.2d at 492.) Consistent with these authorities, we conclude allegations of petitioner's abusive conduct were relevant and could properly be a decisive factor in the court's determination as to the best interest of the children. No error.

Petitioner next contends the trial court abused its discretion in the method used to effect the property distribution, *i.e.*, the marital

residence and pension. He argues the trial court erred by employing the "immediate offset" or "total offset" approach rather than the "reserved-jurisdiction" approach, and that the court should instead have apportioned the value of the residence and the pension. Petitioner arrives at this conclusion by comparing the value of the items, the house at $35,000 and the pension at $31,000 or $32,000. Since the values are so close, the petitioner assumes the marital residence was awarded to the respondent as an offset for the pension plan award to petitioner. Respondent argued below for the use of the offset approach and, on appeal, agrees the court used this approach but argues it was not an abuse of discretion on the facts.

■■ "[A]n equitable division of marital property is not necessarily an equal one ***." (*In re Marriage of Pahlke* (1987), 154 Ill. App. 3d 256, 261, 507 N.E.2d 71, 75.) The trial court has broad discretion under the Act, and its decision regarding apportionment of marital property will not be disturbed unless against the manifest weight of the evidence or an abuse of discretion. (*In re Marriage of Swigers* (1988), 176 Ill. App. 3d 795, 800-01, 531 N.E.2d 858, 861.) *In re Marriage of Thornton* (1980), 89 Ill. App. 3d 1078, 1086, 412 N.E.2d 1336, 1343, for example, held the trial court was justified in awarding a larger portion of the marital property to the ex-wife, following the criteria set out in section 503 of the Act. In *Atkinson v. Atkinson* (1981), 87 Ill. 2d 174, 429 N.E.2d 465, the trial court was held to have acted within its discretion by awarding almost all the property to the ex-wife, where the ex-husband's nonmarital assets were greater and his opportunity to acquire income was better than his ex-wife. *Atkinson*, 87 Ill. 2d at 180, 429 N.E.2d at 468.

■■ Similarly, the choice of the method of apportioning the present value of the marital property interest in retirement benefits remains within the discretion of the trial court. (*In re Marriage of Korper* (1985), 131 Ill. App. 3d 753, 757, 475 N.E.2d 1333, 1336.) Under the total-offset approach, the trial court may, upon its determination of the present value of the pension benefits, award the benefits to the employee spouse and offset this amount with other marital property of similar value. Under the reserved-jurisdiction approach, the court orders the employee spouse to pay an allocated portion of the pension fund to the former spouse as it is disbursed, while retaining jurisdiction to enforce the decree. (*Robinson v. Robinson* (1986), 146 Ill. App. 3d 474, 476, 497 N.E.2d 140, 142.) This court discussed the distinctions between these approaches in *In re Marriage of Emery* (1989), 179 Ill. App. 3d 744, 748, 534 N.E.2d 1014, 1016-17. (See also *In re Marriage of Wisniewski* (1982), 107 Ill. App. 3d 711, 717,

437 N.E.2d 1300, 1305; see also Ill. Ann. Stat., ch. 40, par. 503, Supp. to Historical and Practice Notes, at 67-68 (Smith-Hurd Supp. 1989).) Variations in ages of the parties, amounts of property, both marital and nonmarital, duration of the marriage, health, types of pension, amount of benefits to be received, and other circumstances encountered in dissolution proceedings make it impractical to hold that the disposition of pension entitlement in a dissolution proceeding under section 503 of the Act must always be limited to one approach or the other. *Korper*, 131 Ill. App. 3d at 760, 475 N.E.2d at 1338; Ill. Ann. Stat., ch. 40, par. 503, Supp. to Historical and Practice Notes, at 68 (Smith-Hurd Supp. 1989).

Here, the trial court commented before closing argument that it realized custody was the main issue, but asked for input on property also. Petitioner asked for custody and that he be awarded the marital residence. Respondent presented a more detailed argument on property distribution, including reference to the pension, and suggested the house be awarded to her as custodian of the children, with the value of the house offset against petitioner's pension. Petitioner's rebuttal argument made no reference to this particular point.

Although no expert testimony or actuarial evidence was presented, the present value of the pension was listed in petitioner's financial affidavit as $31,000, petitioner testified it accurately stated his financial standing at the time of the hearing. The trial court was confronted with a situation involving parties with disparate incomes and earning potential. Petitioner worked throughout the marriage while respondent was a homemaker. Both are in their thirties.

■ The circuit court is to consider the custodial provisions made for any children in dividing marital property, and the desirability of awarding the marital residence, or the right to live therein for reasonable periods, to the spouse having custody of the children. Ill. Rev. Stat. 1987, ch. 40, pars. 503(d)(8), (d)(4); see, *e.g.*, *In re Marriage of Legge* (1982), 111 Ill. App. 3d 198, 209, 443 N.E.2d 1089, 1097.

■ ■ Further, as stated in the historical and practice notes on section 503:

> "It is well established that the court should seek to achieve a high degree of finality in the allocation and division of property so that the parties can plan their futures with reasonable certainty and will not be encouraged repeatedly to return to the courts. [Citation.] While easy to articulate, this goal is sometimes difficult to achieve. The allocation of readily divisible assets such as cash, securities, or household goods usually presents little difficulty; however, the division of business inter-

ests, the family home, and contingent interests, such as pension plans, often requires greater balancing of important interests." (Ill. Ann. Stat., ch. 40, par. 503, Supp. to Historical and Practice Notes, at 64-65 (Smith-Hurd Supp. 1989).)

In this case, the respondent, awarded primary physical custody of the children, was also awarded the marital residence and temporary rehabilitative maintenance. Petitioner points out that in *Wisniewski*, this court stated, "This [offset] method is best *only* where the pensioner is close to mandatory retirement age or retirement is otherwise imminent, *and* there are sufficient other marital assets to allow an offset to the nonpensioner spouse." (Emphasis added.) (*Wisniewski*, 107 Ill. App. 3d at 717, 437 N.E.2d at 1305.) We conclude this statement in *Wisniewski* does not create a bright-line test that removes the choice of approach on pension distribution from the discretion of the trial court. Here, petitioner does not contest the equity of the overall property distribution, but only the method the trial court used to reach it. Given the circumstances of the parties and the record before us, we cannot say the trial court abused its discretion.

Affirmed.

GREEN and STEIGMANN, JJ., concur.