*In re* MARRIAGE OF DIANE LEA PHILLIPS, Petitioner-Appellant and Cross-Appellee, and WILLIAM J. PHILLIPS, III, Respondent-Appellee and Cross-Appellant.

Fourth District   No. 4—92—0471

Argued February 16, 1993.—Opinion filed May 13, 1993.

Darrell L. Hartweg (argued), of Luedtke, Hartweg & Turner, of Bloomington, for appellant.

Catherine A. Pratt (argued) and John L. Pratt, both of Bloomington, for appellee.

JUSTICE McCULLOUGH delivered the opinion of the court:

On January 14, 1990, the circuit court of McLean County entered an order dissolving the marriage of Diane and William (Bill) Phillips. Subsequent orders regarding custody, property division, child support, maintenance and attorney fees were also entered. Both Diane and Bill have appealed various aspects of these orders. For the reasons discussed below, we affirm the trial court in part and dismiss part of Diane's appeal.

## I. FACTS

The following is a timetable containing the dates the various orders were entered which are essential to understanding the issues presented in this appeal.

| | |
|---|---|
| January 14, 1990 | Dissolution judgment entered |
| June 18, 1990 | Custody order entered |
| August 29, 1991 | Diane's motion to modify custody order filed |
| January 22, 1992 | Supplemental judgment order pertaining to property division, child support, maintenance and attorney fees entered |
| February 20, 1992 | Order barring testimony of Dr. Laurie Bergner and hearing on motion to modify order of child custody entered |
| February 21, 1992 | Diane's motion to vacate February 20, 1992, order filed |
| April 14, 1992 | Diane's motion to vacate February 20, 1992, order denied |

| May 15, 1992 | Supplemental order pertaining to possession of time-share condominium entered |
| June 2, 1992 | Diane's notice of appeal filed |
| June 12, 1992 | Bill's notice of cross-appeal filed |

Diane and Bill were married in October 1977, and were granted a dissolution of marriage in January 1990. On September 7, 1989, an agreed temporary custody order was entered in which Diane and Bill were awarded temporary joint custody of their three children, William J. Phillips, IV (Jay), born in 1979, Stacey Lea Phillips, born in 1982, and Christopher Ryan Phillips, born in 1983. Diane was awarded possession of the marital residence during the pendency of the action. Paragraph eight of this order stated Diane "shall not permit any male visitors to be present" in the marital residence during the pendency of the action.

At all times throughout the marriage, Bill has worked as a self-employed physical therapist. Diane has an associate degree in physical therapy and worked as a physical therapy assistant for approximately 1½ years after the parties were married. When she became pregnant with their first child, she terminated her employment. Diane did not work outside the home between June 1979 and August 1988. In 1982, she returned to college on a part-time basis, and in 1986 she went back to school full-time. In 1988, Diane graduated with a degree in accounting and began full-time employment as a certified public accountant (CPA).

## II. Analysis

### A. *Custody*

#### 1. Permanent Custody

Diane first contends the trial court's decision awarding permanent custody of the three children to Bill was against the manifest weight of the evidence. She alleges the trial court failed to consider the appropriate statutory factors in determining custody of the children and considered an improper factor, namely an incident which occurred in January 1990 between herself and Ron Green (a colleague of Diane's), Bill and the children.

At the hearing on the custody issue, Bill testified that on January 14, 1990, he had visitation with the children and had picked them up

at noon to take them to lunch. After lunch, they went to a mall in Normal to go to the video arcade. The route they took to get to the mall went past the marital residence, and as they passed that residence, the children noticed their mother's car pulling out of the driveway. They wanted their father to follow their mother to see if she would go with them to the video arcade. Bill followed Diane's car and got her to pull over at which time they both exited their cars. Bill testified that at that point he saw Ron Green in the backseat of Diane's car on the floor under a blanket. He opened the car door and asked him to get out of the car. The children were standing with their father at this time, and when they saw Ron Green, they became very angry. Jay became very upset with his mother and told her he hated her. Bill denied being angry, raising his voice, and cussing or pushing Diane. He was aware that at the time of this incident, the parties had been divorced for approximately 10 days.

Diane testified Bill's car came up behind her on the street and she pulled over. She got out of her car and walked back toward Bill's car at which time he asked her if she wanted to go with him and the children to the video arcade. She testified Bill then asked her if there was somebody in her car. She stated Bill began to push her and she told him that it was none of his business if there was someone in the car. She asked him to take the kids and leave. However, she testified he kept pushing her until they got to her car at which time he opened the car door and became very angry and shouted at her. Diane was scared at this time and the children were upset. She admitted Jay did make the statement that he hated her. Diane also admitted Ron Green had been in the marital residence immediately prior to this incident. She was aware of the agreed order entered regarding the fact that she could not have any male visitors at the marital residence during the pendency of the custody proceedings. She testified Ron Green was under the blanket to protect the people that might be hurt by their friendship.

Other testimony relevant to the custody issue established that prior to Diane's going back to college, she stayed home with the children and worked as a homemaker. When she returned to school, she had a baby-sitter come in and watch the children. After Diane graduated from college, her first job was at an accounting firm. She was employed during tax season and was required to work 56 hours per week. At the same time, she played in a recreational volleyball league. The team would practice one night a week and play one night a week. She would often take the children with her to volleyball practice. When she did not take the children with her, they were cared for by

the baby-sitter, by Bill's daughter from a previous marriage, Dawn, or by Bill.

Bill's work schedule caused him to leave home in the morning between 6 and 7 a.m. On Monday, Wednesday and Friday evenings, he would return home between 7:30 and 9 p.m. and on Tuesdays and Thursday evenings he would return home between 5 and 6 p.m. Diane woke the children in the morning, made them breakfast and got them ready for school with the baby-sitter's help. She testified Bill rarely got the children up and ready for school in the morning. She believed he was usually gone to work by the time the children were out of bed. During the August 1988 school year, Bill began taking the responsibility of driving the children to school.

In 1989, Diane left the first accounting firm she worked for and got a new job with a different accounting firm. She had more flexible hours at this firm and was required to work 48 hours a week during the tax season and 37½ hours a week the rest of the year.

Diane presented testimony from three teachers concerning the children's emotional state. All three teachers testified they knew both Diane and Bill and that both parents attended parent-teacher conferences and other school activities.

Diane presented expert testimony from Dr. Paul Taylor, a registered clinical psychologist. He met with Diane twice and once with each of the children. Dr. Taylor testified that as a result of his examination and consultation with the children, he believed they were experiencing above-average adaptation to the situation of their parents' pending divorce. Dr. Taylor had no preference as to which parent would be the better custodian.

In determining custody, the trial court noted both parties were willing and anxious to have custody of the children, and both were hard workers and had achieved success in their chosen fields. It noted that up until a few years before the dissolution, Diane was the primary caretaker of the children, but in the last couple years, Bill had become more involved with the children. The trial court noted Dr. Taylor's report, which indicated he could not recommend a preference as to which parent would be a better custodian. The trial court characterized the children as exceptional children in the way they were dealing with the divorce. The trial court found it unusual for a mother to work 56 or more hours a week and then play volleyball until midnight. The trial court noted Bill's schedule was more flexible than Diane's in terms of having time to have activities with the children. As to the January 14 incident, the trial court specifically stated:

"[T]his matter ought not rise and fall on what happened on January 14, and I have no concern about any moral issue or any issue of a relationship of another man. *** The petitioner suggests that the respondent caused that incident. My perception of the evidence, and I have had the opportunity to view the parties, their demeanor, and to make an assessment of their credibility, was that Mr. Phillips followed Mrs. Phillips innocently. There is no suggestion by anybody at this point that he knew anybody was in that car other than her, and that his reason for following her was for anything else than those children—his kids' sake and her kids' desire for her to be with them. He followed her for a long time. I can't tell from the evidence whether she refused to pull over or he couldn't catch up with her, but obviously from my evidence of the community, there was more than a mile or two that he had to follow her in order to get her to stop.

There followed a confrontation. Mrs. Phillips would have me believe that he is responsible for that confrontation; that he was aggressive, argumentative, loud, angry, and cursed at her. Although I don't think her testimony said he cursed at her. Yet he's not the person who is anyway at that time attempting to deceive anybody. Having a person hide on the backseat floor of a car under a blanket is not something that suggests to me a person who is honest. That is not innocent behavior. That's not an effort to protect anybody; that's an effort to deceive people.

* * *

The issue on January 14 does not suggest someone who is honest, and so thereby weakens her testimony.

***

But I frankly believe that the evidence strongly suggests that the best interests of these children is that they be with their father. There's no suggestion that he's going to deceive them. There's no suggestion that he has other interests that are of more paramount interest to him."

The trial court then awarded permanent custody of the three minor children to Bill.

In making a custody determination, the court has the duty to consider all relevant factors set forth in the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1989, ch. 40, par. 101 *et seq.*). The court shall not consider conduct of a present or proposed custodian that does not affect his relationship to the child. (Ill. Rev. Stat. 1989, ch. 40, par. 602(b).) Although it is improper for a court to

presume harm to a child, based on the parents' allegedly immoral conduct, evidence bearing on the stability of the child's environment is obviously relevant. *In re Marriage of Stone* (1987), 164 Ill. App. 3d 1046, 1053, 518 N.E.2d 402, 407.

The primary and paramount consideration in a child custody case is the best interest and welfare of the child. (*In re Marriage of Wiley* (1990), 199 Ill. App. 3d 169, 175, 556 N.E.2d 809, 813.) The determination of child custody rests largely within the broad discretion of the trial court and its decision will not be disturbed on appeal unless it is against the manifest weight of the evidence or unless the court has abused its discretion. *In re Marriage of Siegel* (1984), 123 Ill. App. 3d 710, 715, 463 N.E.2d 773, 778.

An application of these statutory factors establishes the trial court's award of permanent custody of the children to Bill was not against the manifest weight of the evidence. First, both parents expressed a desire and willingness to have custody of the children. Second, none of the children expressed a preference as to with whom they wished to live. Each child got along well with his or her siblings and generally each had a good relationship with his or her parents. Next, each of the children's teachers testified the respective child was doing well in school, scholastically as well as in interacting with other children. All three children were found to be in good physical and mental health and there was no indication of any physical abuse.

The trial court did consider the January 14 incident but only to the extent that it reflected on Diane's credibility and her intent to deceive people. Evidence suggested this was a coincidental meeting between Diane, Bill and Ron Green. Moreover, there was evidence to establish that Jay was very upset by this incident. Thus, the trial court properly considered this evidence as it affected Diane's relationship with her son. However, we do not believe, as Diane suggests, the trial court placed improper emphasis on the incident. Either parent would have been an appropriate custodian. The order awarding custody to the father was not against the manifest weight of the evidence.

### 2. Modification of Custody

On August 29, 1991, approximately 14 months after the permanent custody order, Diane filed a "Petition to Modify Order of Child Custody," and a hearing on that petition was held on February 11, 1992. At that hearing, Diane attempted to elicit testimony from Dr. Laurie Bergner, a psychologist, regarding their daughter, Stacey. Bill asserted the privilege against disclosure of this information, contained in section 10(a) of the Mental Health and Developmental Disabilities

Confidentiality Act (Confidentiality Act) (Ill. Rev. Stat. 1989, ch. 91½, par. 810(a)), on Stacey's behalf. Bill objected to this testimony and asserted this privilege on behalf of Stacey as custodial parent pursuant to section 608(a) of the Act (Ill. Rev. Stat. 1989, ch. 40, par. 608(a)). The trial court sustained Bill's objection to Dr. Bergner's testimony and found that Bill had authority, as custodial parent, to assert the privilege against disclosure on Stacey's behalf.

The trial court then sought to proceed with the hearing and allow Dr. Bergner to testify for purposes of making a record for this court. The court indicated it would hear the testimony of Dr. Bergner as an offer of proof. After discussions between Diane and her attorney, she decided to stand on the ruling made by the court regarding the barring of Dr. Bergner's testimony. It appears from the record that Diane's attorney was under the belief she could appeal this decision pursuant to section 10(b) of the Confidentiality Act (Ill. Rev. Stat. 1989, ch. 91½, par. 810(b)). Diane made a motion for the appointment of a guardian *ad litem* to make an independent investigation of the issue presented. That motion was denied.

A written order filed on February 20, 1992, provided that Bill, as Stacey's custodial parent, had the authority pursuant to section 608(a) of the Act to assert the privilege set forth in section 10(a) of the Confidentiality Act against disclosure of her mental health records. The testimony of Dr. Bergner was barred and Diane's oral motion for a guardian *ad litem* was denied. The trial court specifically found this order to be final for purposes of appeal consistent with section 10(b) of the Confidentiality Act. The trial court did not, however, make a ruling on the petition to modify the child custody order.

Diane did not then file a notice of appeal under section 10(b) of the Confidentiality Act or a notice of interlocutory appeal pursuant to Supreme Court Rule 306(a)(1)(v) or 307(a) (134 Ill. 2d Rules 306(a)(1)(v), 307(a)). Rather, Diane's notice of appeal, filed June 2, 1992, purports to appeal the orders entered on June 18, 1990 (custody), January 22, 1992 (property division, child support, maintenance, attorney fees), May 15, 1992 (time-share of condominium), and April 14, 1992 (order barring the testimony of Dr. Bergner).

Section 10(b) of the Confidentiality Act states: "Any order to disclose or to not disclose shall be considered a final order for purposes of appeal and shall be subject to interlocutory appeal." (Ill. Rev. Stat. 1989, ch. 91½, par. 810(b).) In *People v. Phipps* (1979), 79 Ill. App. 3d 532, 398 N.E.2d 650, *rev'd on other grounds* (1980), 83 Ill. 2d 87, 413 N.E.2d 1277, this court held section 10(b) of the Confidentiality Act void. In reaching that conclusion, this court stated:

"[T]o the extent that section 10(b) attempts to provide for appeals from less than final judgment, it is an unconstitutional infringement by the legislature upon the rulemaking power of the supreme court and is therefore void." (*Phipps*, 79 Ill. App. 3d at 537, 398 N.E.2d at 653.)

(See also *Kmoch v. Klein* (1991), 214 Ill. App. 3d 185, 573 N.E.2d 267.) Accordingly, had Diane filed a notice of appeal of the order barring the testimony of Dr. Bergner pursuant to section 10(b) of the Confidentiality Act, we would be required to dismiss her appeal. We note the recent decision of *Almgren v. Rush-Presbyterian-St. Luke's Medical Center* (1992), 240 Ill. App. 3d 585, 608 N.E.2d 92, in which the First District Appellate Court found that the Confidentiality Act did not conflict with supreme court rules since orders appealable under the Confidentiality Act are also appealable under Supreme Court Rule 307(a)(1) (134 Ill. 2d R. 307(a)(1)), which permits interlocutory appeals from orders granting or denying injunctions. (*Almgren*, 240 Ill. App. 3d at 589, 608 N.E.2d at 94.) However, we find that decision distinguishable because, as discussed below, that part of Diane's appeal which purports to appeal the barring of Dr. Bergner's testimony must be dismissed not because of any injunctive effect of the trial court's order barring that testimony, but because there is no final order on the petition to modify child custody order.

Diane instead included this order in her notice of appeal from the final property distribution order entered on May 15, 1992.

◼ The February 20, 1992, order only barred the testimony of Dr. Bergner; it did not address the merits of Diane's petition. Because of the trial court's belief that Diane could then appeal its order barring the doctor's testimony pursuant to section 10(b) of the Confidentiality Act, it failed to specifically rule on the petition to modify the child custody order.

A final judgment has been defined as a determination by the court on the issues presented by the pleadings which ascertains and fixes absolutely the rights of the parties in the lawsuit. A judgment is final if it determines the litigation on the merits so that, if affirmed, the only thing remaining is to proceed with execution of the judgment. (*Puglisi v. Hansford* (1990), 193 Ill. App. 3d 803, 808, 550 N.E.2d 618, 622.) A determination as to whether the testimony of Dr. Bergner was properly excluded would not determine the merits of the petition so that the only thing remaining would be the execution of the judgment. Since there is no final order on the petition to modify child custody order, we must dismiss that part of Diane's appeal which purports to appeal the barring of Dr. Bergner's testimony.

### B. *Property Division*

#### 1. Nonmarital Property

Diane alleges the trial court abused its discretion in classifying the corporation, William J. Phillips, III, Ltd., as nonmarital property. She asserts that pursuant to section 503(b) of the Act (Ill. Rev. Stat. 1989, ch. 40, par. 503(b)), all property acquired after the marriage was presumed to be marital property unless this presumption is overcome. She concludes Bill failed to overcome this presumption, so the corporation ought to have been classified as marital property.

Bill contends the trial court correctly classified the corporation as nonmarital property. He claims that pursuant to section 503(a)(2) of the Act (Ill. Rev. Stat. 1989, ch. 40, par. 503(a)(2)), he merely exchanged property acquired before the marriage for this property, thus making the corporation nonmarital property.

Bill began his physical therapy practice in 1973 as a sole proprietorship. Bill and Diane were married in 1977 and the business was incorporated in 1981. Bill is the sole stockholder, officer and director of the corporation. Diane has never been personally liable for any debts of the corporation, prior to or after the incorporation. She performed some bookkeeping services for the corporation but was never paid a salary for these services. Diane did not negotiate any contracts for the corporation but did assist in interviewing one man for an office manager position. Bill would discuss the corporation's business with Diane and she accompanied him to some business meetings. Bill never intended Diane to have any control over the corporation.

Section 503(a)(2) of the Act provides, in pertinent part:

> "(a) For purposes of this Act, 'marital property' means all property acquired by either spouse subsequent to the marriage, except the following, which is known as 'non-marital property':
> ***
> (2) property acquired in exchange for property acquired before the marriage or in exchange for property acquired by gift, legacy or descent." (Ill. Rev. Stat. 1989, ch. 40, par. 503(a)(2).)

Section 503(b) of the Act (Ill. Rev. Stat. 1989, ch. 40, par. 503(b)) provides that all property is presumed to be marital property unless that presumption is overcome by a showing that the property was acquired by one of the methods listed in section 503(a) of the Act.

In *In re Marriage of Thacker* (1989), 185 Ill. App. 3d 465, 541 N.E.2d 784, the husband started a painting business as a sole proprietorship three years before the parties married. As such, it was prop-

erty acquired before the marriage belonging solely to the husband. The husband subsequently incorporated the business after the marriage. Twenty shares of stock were transferred to the wife, but she never received any of the stock certificates. The husband testified he never intended to give the wife the shares of stock, or for her to have any right to control the operation of the business. At the time of the incorporation, the husband's accountant recommended the wife receive the shares of stock so that in the event of the husband's death, the business could remain in operation. The wife contributed no income to the business and did not become liable for any corporate debts; however, she worked part-time without pay for the corporation.

The court concluded the trial court erred in classifying this business as marital property. The court noted the wife's contributions after the marriage to the business were not substantial enough to convert the business to a marital asset. More importantly, the court stated: "If Vernon had issued all stock to himself, clearly this exchange of assets would fall under subsection [503](a)(2) [of the Act]." *Thacker*, 185 Ill. App. 3d at 468, 541 N.E.2d at 786.

But, because the tax and incorporation forms of the corporation listed the wife as a shareholder, the husband had to rebut the presumption that the corporation was marital property. The court believed the designation on the tax returns was too ambiguous in and of itself to establish that the husband intended to convey a gift to the marriage. The court further noted the wife was to receive this stock only because of advice from the husband's accountant, and in fact, she never received the stock certificates. The husband never intended to give her the stock nor did he ever intend for her to exercise any control over the business. Under these circumstances, the husband successfully rebutted the presumption that the corporation was marital property.

In the present case, the stock issued to Bill was merely an exchange of assets for his nonmarital interests in the business. Diane had authority to sign checks for the business, paid some of the corporate bills, and attended various business meetings with Bill. She performed some bookkeeping services for the corporation. Nevertheless, these contributions were insufficient to convert the business into a marital asset. Diane only worked part-time, was never paid a salary, and was not the only bookkeeper for the business. She never exercised any control over the business and Bill never intended for her to do so. She had no liability on the corporate debts and did not contribute income to the business. Therefore, the trial court did not abuse its discretion in classifying the corporation as nonmarital property.

## 2. Goodwill Value of Corporation

As part of his cross-appeal, Bill contends the trial court erred by including goodwill value in its valuation of the business. Based on *In re Marriage of Zells* (1991), 143 Ill. 2d 251, 572 N.E.2d 944, he asserts that the value of professional goodwill should not be included in determining the value of a business. Bill concludes the trial court's order valuing the corporation must be reversed.

Bruce Holtz, Diane's expert, valued the corporation at $85,119 as of January 1990, the date of dissolution. He arrived at this figure by adding the goodwill value ($19,000) and the net asset value ($65,000). Bill's expert, Thomas W. Thoennes, valued the corporation at $65,535, basing his figure solely on the value of the corporation's net assets. He did not believe the intangible asset of goodwill should be included in the value of the corporation because the close relationship between Bill and his main customer, Dr. Wright, was not a saleable asset. The trial court classified the corporation as Bill's nonmarital property and valued it at $85,000.

In *Zells*, the supreme court addressed whether professional goodwill is an asset and subject to division or distribution. The supreme court held professional goodwill is not subject to valuation, division or distribution. *Zells*, 143 Ill. 2d at 252, 572 N.E.2d at 945.

In *Zells*, the trial court purported to divide the marital assets but offset an award of real assets to the ex-wife against the professional goodwill of the lawyer ex-husband's law practice. The supreme court noted: "Goodwill represents merely the ability to acquire future income. Consideration of goodwill as a divisible marital asset results in gross inequity." *Zells*, 143 Ill. 2d at 254, 572 N.E.2d at 945.

The court noted the conflict between the panels of the appellate court on whether the goodwill of a professional business is marital property subject to division, and adopted the reasoning of the Third District Appellate Court in *In re Marriage of Courtright* (1987), 155 Ill. App. 3d 55, 507 N.E. 891. The *Zells* court stated:

> " 'Although many businesses possess this intangible known as good will, the concept is unique in a professional business. The concept of professional good will is the sole asset of the professional. If good will is that aspect of a business which maintains the clientele, then the good will in a professional business is the skill, the expertise, and the reputation of the professional. It is these qualities which would keep patients returning to a doctor and which would make those patients refer others to him. The

bottom line is that this is reflected in the doctor's income-generating ability.

\* \* \*

Although good will was not considered in the court's valuation of the business itself, it was a factor in examining [the husband's] income potential. To figure good will in both facets of the practice would be to double count and reach an erroneous valuation.' " *Zells*, 143 Ill. 2d at 255-56, 572 N.E.2d at 946, quoting *Courtright*, 155 Ill. App. 3d at 58-59, 507 N.E.2d at 894.

The court concluded:

"Adequate attention to the relevant factors in the Dissolution Act results in an appropriate consideration of professional goodwill as an aspect of income potential. The goodwill value is then reflected in the maintenance and support awards. Any additional consideration of goodwill value is duplicative and improper." *Zells*, 143 Ill. 2d at 256, 572 N.E.2d at 946.

■ Therefore, the supreme court did not say goodwill cannot be included when valuing a corporation; rather, the court held that professional goodwill is not subject to valuation, division, or distribution as a marital asset, but should instead be reflected in maintenance and support awards. The trial court here did not attempt to value, divide or distribute the goodwill of the corporation as a marital asset in a sense that contravenes *Zells*. Rather, the court considered the goodwill value of the corporation in giving the corporation a monetary value and used that figure to determine the appropriateness of maintenance. This *Zells* permits.

### 3. Marital Property

Next, Diane contends the trial court abused its discretion in dividing the marital assets and further contends the trial court failed to consider the relevant statutory factors in dividing the marital assets. She alleges Bill has a substantially greater earning power and a better opportunity to acquire future assets, as evidenced by his operation of a successful business. She asserts Bill will be able to continually outearn her in the future and that, along with the fact that Bill got a greater share of the nonmarital property, justifies awarding her a greater share of the marital assets.

Bill has cross-appealed the trial court's division of the marital property. He alleges the application of the various factors enumerated in section 503(d) of the Act (Ill. Rev. Stat. 1989, ch. 40, par. 503(d)) demonstrates that the court should have adopted the distribution

schedule he had proposed. Specifically, Bill asserts that because (1) he is the custodial parent, (2) he made a "significantly greater" contribution to both the marital and nonmarital estates, (3) he is 13 years older than Diane and (4) has that many years less to acquire income and assets, he is entitled to a greater share of the marital property.

The following chart is a breakdown of the trial court's division of the marital assets:

|  | Diane | Bill |
|---|---|---|
| Real estate | $ 6,666.67 | $157,462.40 |
| Bank accounts | 28,156.47 | 1,575.39 |
| Retirement accounts | 72,048.44 | 73,134.29 |
| Insurance policies | 78,140.22 | 100,446.73 |
| Vehicles | 8,100.00 | 12,400.00 |
| Personal property | 18,542.00 | 1,790.00 |
| Debt |  | ( 59,389.75) |
| TOTAL | $211,653.80 | $287,419.06 |

Bill was also awarded $135,810.98 in nonmarital property, which included the corporation, while Diane received $33,970.42 worth of nonmarital property.

Section 503(d) of the Act sets forth the factors to be considered in dividing marital property. This section allows the trial court discretion to divide marital property into "just proportions," taking into consideration all of the factors listed as well as any others deemed relevant to the case. The touchstone of proper apportionment is whether it is equitable in nature, with each case resting on its own facts. (*In re Marriage of Riech* (1991), 208 Ill. App. 3d 301, 308, 566 N.E.2d 826, 830.) The circuit court is to consider the custodial provisions made for any children in dividing marital property, and the desirability of awarding the marital residence, or the right to live therein for a reasonable period of time, to the spouse having custody of the children. *In re Marriage of Wiley* (1990), 199 Ill. App. 3d 169, 178, 556 N.E.2d 809, 815.

Absent an abuse of discretion whereby no reasonable person could adopt the trial court's position, a reviewing court will not substitute its judgment for that of the trial court in marital property matters. *In re Marriage of Hart* (1990), 194 Ill. App. 3d 839, 847, 551 N.E.2d 737, 741.

■ The major asset of the marital estate was of course the marital residence. As custodial parent, Bill was awarded the marital residence. As to the rest of the marital assets, Diane received the majority of the money in the bank accounts. The retirement accounts, the

insurance policies and the personal property were divided almost equally. The vehicles were divided by agreement. Finally, Bill was required to pay almost $60,000 of marital debt, which included Diane's attorney fees. The trial court did not abuse its discretion in dividing the marital assets.

### 4. Time Share

Bill and Diane owned three weeks in a time-share condominium at the Lake of the Ozarks. Diane valued these three weeks at $20,000 while Bill testified the total value was $13,000. Neither party testified that any one week had more or less value than any other week. The trial court assigned a $20,000 value to the three weeks and awarded Bill two-thirds of the value and Diane the remaining one-third.

Bill contends the trial court abused its discretion in valuing and dividing the parties' time-share property. He asserts there was no evidence to suggest the three separate weeks were of equal value; thus, he believes it was error to divide the weeks on the basis of an equal value for each week.

As Bill has cited no authority in his brief to support his contention, he has waived the resolution of this issue. Mere contentions, without argument or citations of authority, do not merit consideration on appeal. (*In re Tally* (1991), 215 Ill. App. 3d 385, 574 N.E.2d 1262; 134 Ill. 2d R. 341(e)(7).) Furthermore, no evidence was presented to support the proposition that the three weeks were not of equal value. Thus, the trial court did not abuse its discretion in dividing the time-share property.

### C. Maintenance

The trial court awarded Diane rehabilitative maintenance in the amount of $235 per month for a period of three years. In giving its reasons for the award, the court stated it considered "the relative disparity in the current income-producing capabilities of each of the parties to a marriage which lasted somewhat over 12 years in duration and the educational benefits that Diane has received during the marriage."

Both parties contend the trial court abused its discretion in awarding rehabilitative maintenance to Diane. Bill asserts the trial court abused its discretion because Diane did not lack sufficient income and property to provide for her reasonable needs. Alternatively, Bill suggests if this court upholds the award of maintenance, it should increase neither the amount nor the duration of the award.

Diane believes she is entitled to an award of rehabilitative maintenance but further believes the trial court abused its discretion in the amount and duration of the award as well as its failure to provide for a review of the award at the end of the maintenance term.

Section 504(a) of the Act provides a court may grant maintenance only if it finds the spouse seeking maintenance:

"(1) lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs, and

(2) is unable to support himself through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home, or

(3) is otherwise without sufficient income." Ill. Rev. Stat. 1989, ch. 40, pars. 504(a)(1), (a)(3).

Section 504(b) of the Act provides: "[t]he maintenance order shall be in such amounts and for such periods of time as the court deems just." (Ill. Rev. Stat. 1989, ch. 40, par. 504(b).) What constitutes a "just" time period for the award is made on the consideration of all relevant factors, including (1) the financial resources of the party seeking maintenance, including his or her marital property; (2) the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment; (3) the standard of living established during the marriage; (4) the duration of the marriage; (5) the age and the physical and emotional condition of each of the parties; (6) the ability of the spouse paying maintenance to meet his or her needs while meeting those of the spouse seeking maintenance; and (7) the tax consequences of the property division of the parties. Ill. Rev. Stat. 1989, ch. 40, par. 504(b); *In re Marriage of Kerber* (1991), 215 Ill. App. 3d 248, 253, 574 N.E.2d 830, 833.

An award of maintenance is within the discretion of the trial court and will not be reversed on appeal unless it constitutes an abuse of discretion or is against the manifest weight of the evidence. (*In re Marriage of Hensley* (1991), 210 Ill. App. 3d 1043, 1048, 569 N.E.2d 1097, 1100.) An abuse of discretion occurs where no reasonable person would take the view adopted by the trial court. (*In re Marriage of Cheger* (1991), 213 Ill. App. 3d 371, 378, 571 N.E.2d 1135, 1140.) Where the court has specific evidence regarding educational background, present educational pursuits, and income at the time of the dissolution, there is sufficient evidence to set a specific period of time for maintenance. *Cheger*, 213 Ill. App. 3d at 379, 571 N.E.2d at 1140.

██ Diane and Bill were married for approximately 12 years, most of which Diane spent as homemaker and mother. Just prior to the dissolution, she obtained her college degree in accounting and full-time employment as a CPA. At the time of the hearing, Diane was earning approximately $23,000 gross as a CPA and Bill had a salary of approximately $105,000 per year. The standard of living was quite high during the marriage and Diane's standard of living drastically changed after the dissolution. Both parties are in good physical and emotional condition. Given these factors, the trial court did not abuse its discretion in awarding maintenance for a specific period of time.

### D. *Child Support*

Diane contends the trial court abused its discretion in ordering her to pay $235 per month, 16% of her net income, to Bill for child support. She alleges that given their respective earnings and financial positions and the visitation schedule, which places the children with her for a significant amount of time, any award of child support was an abuse of discretion.

Section 505(a) of the Act provides that a court:

> "may order either or both parents owing a duty of support to a child of the marriage to pay an amount reasonable and necessary for his support, without regard to marital misconduct. The duty of support owed to a minor child includes the obligation to provide for the reasonable and necessary physical, mental and emotional health needs of the child." Ill. Rev. Stat. 1989, ch. 40, par. 505(a).

In determining the minimum amount of support, guidelines are given; however, the court may deviate from them after considering evidence presented on all relevant factors. If the court does deviate from these guidelines, it is required to make express findings stating its reasons for such a deviation. (Ill. Rev. Stat. 1989, ch. 40, par. 505(a)(2).) For three children, the minimum support is 32% of the supporting parties' net income. Ill. Rev. Stat. 1989, ch. 40, par. 505(a)(1).

The relevant factors to be used by trial court include, but are not limited to, (1) the financial resources of the child; (2) the financial resources and needs of the custodial parent; (3) the standard of living the child would have enjoyed had the marriage not been dissolved; (4) the physical and emotional condition of the child, and his educational needs; and (5) the financial resources and needs of the noncustodial parent. Ill. Rev. Stat. 1989, ch. 40, par. 505(a)(2); *In re Marriage of Stockton* (1988), 169 Ill. App. 3d 318, 325-26, 523 N.E.2d 573, 579.

The trial court found "it was appropriate on the basis of the distribution of the marital and nonmarital assets and the relative financial position of each of the parties[,] including marital and nonmarital assets assigned, current income and potential future income," that Diane pay child support of 16% of her net income, $235 per month. In accordance with the statutory guidelines, Diane would be ordered to pay 32% of her net income to Bill in child support for their three children. However, the trial court deviated from the guidelines and properly stated its reasons for doing so.

■ Diane's monthly net income was $1,469.10. She had no other source of income except her share of the marital property. Because of the circumstances of the parties, the trial court could reasonably conclude that ordering her to pay 32% of her net income was unreasonable. Therefore, the trial court was within its discretion in deviating from the statutory guidelines.

The visitation order of June 18, 1990, provides Diane has visitation with the children every other weekend, one-half of the summer vacation, for 3½ hours on Tuesdays and Thursdays and alternate holidays in the year. Diane has cited no authority, and our research has revealed none, to support her contention that she should not have to pay child support because of the visitation schedule. Furthermore, our review of the facts of this case and subsequent application of the statutory factors to those facts indicate no abuse of discretion by the trial court in ordering Diane to pay this amount of child support.

### E. *Attorney Fees*

Bill contends the trial court abused its discretion by ordering him to pay Diane's attorney fees. The trial court ordered Bill to pay all of the parties' debts, which included $13,947.60 for Diane's attorney fees. Bill alleges Diane failed to prove, and the trial court did not find, she was unable to pay her own attorney fees. He believes her income through her job as a CPA and the property she was awarded in the dissolution proceeding establishes her financial ability to pay her own attorney fees.

The propriety of an award of attorney fees is dependent upon a showing by the party seeking them of the inability to pay and demonstration of the ability of the other spouse to do so. (*In re Marriage of Bussey* (1985), 108 Ill. 2d 286, 299-300, 483 N.E.2d 1229, 1235.) A court may consider a party's prospective as well as his current income in awarding attorney fees. (*Milligan v. Cange* (1990), 200 Ill. App. 3d 284, 292, 558 N.E.2d 630, 635.) It is not necessary that the spouse seeking an award of attorney fees be destitute; it is sufficient that

payment would exhaust his estate or strip him of his means of support or undermine his economic stability. (*In re Marriage of Ziemer* (1989), 189 Ill. App. 3d 966, 969, 546 N.E.2d 229, 230.) The allowance of attorney fees in a dissolution case and the proportion to be paid by each party are within the trial court's discretion and will not be disturbed on appeal absent an abuse of that discretion. *Riech*, 208 Ill. App. 3d at 312, 566 N.E.2d at 832.

■ The evidence established that Diane's attorney fees were approximately $13,947, which constituted nearly half of her yearly income. Bill's salary established his financial ability to pay Diane's attorney fees. Thus, the trial court did not abuse its discretion by ordering Bill to pay Diane's attorney fees.

### III. CONCLUSION

In conclusion, we dismiss that part of Diane's appeal pertaining to the February 20, 1992, order barring the testimony of Dr. Bergner. We conclude the trial court did not abuse its discretion in awarding permanent custody of the children to Bill, or with respect to issues relating to the property distribution, maintenance, child support or attorney fees. As to all those matters, we affirm.

Affirmed in part; dismissed in part.

COOK and LUND, JJ., concur.