*In re* MARRIAGE OF ALEXANDRA GIBBS, n/k/a Alexandra Engler, Petitioner-Appellant and Contemnor, and PETER GIBBS, Respondent-Appellee.

First District (4th Division)    Nos. 1—93—0079, 1—93—0146, 1—93—0184 cons.

Opinion filed December 30, 1994.—Rehearing denied January 26, 1995.

Jerome Marvin Kaplan, of Chicago, and Edward I. Stein, Ltd., of Northbrook, for appellant.

John F. Martoccio, of Hinsdale, for appellee.

PRESIDING JUSTICE HOFFMAN delivered the opinion of the court:

The petitioner, Alexandra Engler, appeals from several orders which denied her petition to remove her son, Palmer Gibbs, from Illinois to Florida, found her in contempt of court, and allowed extended visitation for Palmer's father, Peter Gibbs. This court stayed those orders pending appeal. We consider: (1) whether the trial court's denial of Alexandra's request to remove Palmer from Illinois to Florida was against the manifest weight of the evidence; (2) whether the finding of contempt against Alexandra was an abuse of discretion; and (3) whether the trial court had jurisdiction to enter the order allowing Peter extended visitation when it was entered after this court entered a stay order. For the following reasons, we affirm in part, reverse in part, and vacate in part.

The marriage between Alexandra and Peter was dissolved in 1989. Alexandra was initially awarded sole custody of Palmer, who was born on November 28, 1985, but the judgment of dissolution was later amended and provided that "major issues regarding Palmer's health and education shall be made jointly by Alex and Peter."

Alexandra filed a petition to modify and enforce the judgment on February 19, 1991, requesting an order allowing her to remove Palmer to Florida because she was engaged to Alexander Engler,

who was a resident of Florida. She amended her petition on June 7, 1991, to state that she had married Engler. She alleged that it was in Palmer's best interest to move to Florida because she wished to continue sole permanent custody of Palmer, Palmer wanted to live with his mother and not his father, Palmer had a close relationship with Engler, and Palmer was enrolled in school in Florida.

In a court hearing on other matters on April 23, 1991, Alexandra's lawyer informed the court that Alexandra married Engler and would be leaving for Florida on May 1. During the hearing, the judge stated: "I'll give the mother the right, without prejudice, to go to Florida ***"; and "I'll let the mother go on vacation to Florida." He later stated: "I'm not giving her permission to leave the state, period," and "I'm leaving everything status quo." In a later hearing, when advised that Alexandra had moved to Florida, the judge stated: "all of this has not been done with the approval and consent of the court."

The trial judge held an evidentiary hearing on Alexandra's petition for removal which took place over a period of more than a year where he heard the testimony of several witnesses.

Alexandra testified that she worked as a flight attendant for 12 years but quit in April 1991 because she was having back and elbow problems. She could not stand or sit for long periods of time. At the time she left, she was earning about $25,000 per year. Anticipating that she would need to change jobs, Alexandra telephoned two department stores between October 1990 and April 1991 to inquire about sales clerk positions. Apparently, there were no openings. At the time, she was living in a house in the suburbs of Chicago.

Alexandra also testified that Peter was about $10,000 in arrears on child support. Child support was reduced from $1,600 per month to $650 per month in January 1991 after Peter became unemployed. Alexandra has no other source of income and her new husband supports her and Palmer.

In 1989, Peter saw Palmer 23 out of 25 weekends, and 38 out of 52 weekdays. In 1990, Peter saw Palmer 23 out of 25 weekends, and 40 out of 51 weekdays. Palmer was resistant to seeing Peter in 1989 and 1990. Since Alexandra and Palmer moved to Florida, Peter has seen Palmer 54 out of 59 days that he has been allowed visitation.

Alexandra and Palmer moved to Florida in May 1991 when she married Engler. Engler has been a resident of Miami for about 30 years and has close family and friends there. Alexandra's parents also live in Florida, about four hours away by car, and they visit often. Since the move, Palmer is not as resistant to seeing Peter as he was before.

Alexandra testified that their lives would change drastically if she was required to move back to Illinois because she would have to work while now she is a full-time mother. She could not afford a similar house in a comparable school district. It would also put a strain on her marriage. According to Alexandra, moving back to Illinois would make Palmer "miserable." Palmer has no relatives other than his father in Illinois. If ordered to return, she would have to work as a sales clerk if her back improved. If allowed to remain in Florida, Alexandra would assume Palmer's medical expenses and share in the travel expenses. She would also grant Peter three weeks of visitation in the summer, one week to Peter's parents, three days each month, and split other school vacation time. In addition, Peter would be welcome in Florida at any time.

Engler testified that he had a wonderful relationship with Palmer and they were best friends. He has never considered moving to Illinois because he has deep roots in Florida. He worked as a pilot based in Washington, District of Columbia, although he was transferred to Miami prior to the trial's end. He could work out of Chicago for the same airline but he would have to take a pay cut of possibly $5,000; he currently earns $96,000 per year. To maintain his current position and salary but live in the Chicago area, he would have to fly to Miami a day before his scheduled flight and stay in a hotel and then fly back to Chicago after his trip. Engler had not given any thought as to whether he would come with Alexandra if she was ordered to return to Illinois with Palmer. He had not requested to be transferred to Chicago. He has been married four times and he has one child from another relationship.

Peter testified that he did not want Palmer to live in Florida because it would hurt their relationship; he would not be able to spend as much time with Palmer or be involved in his life. After Palmer moved to Florida, it was difficult to visit with Palmer or to telephone him. Often the answering machine would be on or there would be no answer and his call would not be returned. Because of the move, Peter has not been able to see Palmer on the regular visitation schedule. Peter has heard Palmer refer to Engler as "dad" and Palmer refers to Peter as "Peter" on the telephone. When they are together, however, Palmer refers to Peter as "dad." Peter believed that if Palmer was allowed to move to Florida, his contact would be severely limited. He was concerned that Engler was a bad influence on Palmer and he was concerned for Palmer's safety because Engler had a history of violence against women and children. One of Engler's ex-wives and one of his former girl friends testified that he had physically hurt them and threatened them.

Palmer was interviewed by the trial judge in chambers. Palmer had already moved to Florida. He stated he did not like living in Chicago because it was too "freezing." He liked his house in Florida because it had a pool.

Alexandra offered the testimony of Dr. Ner Littner, a psychiatrist, who testified that he saw Palmer about seven times. Littner testified that Palmer had separation anxiety in 1988, started to improve, but then went backwards after a nine-day separation from his mother in 1991. Littner believed that Palmer was happy in Florida. After an interview with Peter, he believed that Peter was motivated to fight the move to Florida out of anger toward Alexandra.

Peter presented the testimony of Dr. Leonard Elkun, a psychiatrist who was not board certified in Illinois. Elkun testified that based on his interviews with the parties, Palmer needed continuing contact with Peter and Palmer may interpret their separation as abandonment. He also testified that Palmer was not suffering from separation anxiety. He believed living in Florida would have a detrimental effect on Palmer.

In an order dated September 30, 1992, Judge Plusdrak found that Palmer needed to have a close relationship with his father, Alexandra had been "vigorous in her motivation to frustrate or restrict" Peter's visitation rights, Peter opposed the petition to remove because of parental love for Palmer rather than hatred for Alexandra's husband, and removal would "hamper realistic and reasonable visitation" between Peter and Palmer. The judge also found that the move would not enhance Alexandra's chances for employment, her husband had not applied to transfer to Chicago, it was in Palmer's best interest to remain in Illinois, and Alexandra did not sustain her burden of proof. In his oral ruling, the judge additionally found that Palmer's testimony in chambers was "programmed." The judge denied Alexandra's petition to remove and ordered her to "make prompt arrangements" to return Palmer to Illinois within three weeks and ordered that Peter's visitation rights under previous court orders would continue.

Alexandra filed a timely motion to reconsider that order, but before the hearing on the motion, Judge Plusdrak retired and the case was reassigned to Judge Close. In the hearing on the motion to reconsider on December 22, 1992, the judge summarily denied the motion.

On January 8, 1993, Alexandra filed a notice of appeal from the orders denying her motion to reconsider and her petition for removal.

Also on January 8, 1992, Peter filed an emergency petition for a rule to show cause alleging that Alexandra did not comply with the court's order to return Palmer to Illinois and that Alexandra did not comply with the court's order regarding visitation. Peter also requested the court to grant him custody of Palmer.

In a hearing on Peter's petition for a rule to show cause, Peter testified that on December 4, 1992, Alexandra told him she was not planning to move back to Illinois. He also testified that since August 1992, he was not allowed all of his weekend visitations with Palmer. Alexandra testified that she had not made arrangements to move herself and Palmer back to Illinois and she denied telling Peter that she would not move back to Illinois. She also testified that her attorney advised her the order requiring her to return Palmer to Illinois was stayed with the motion to reconsider. She further stated that if the court ordered her to return Palmer to Illinois, she would comply with that order.

The judge found that Alexandra violated the court's order allowing her custody of Palmer when she left the jurisdiction without applying to remove Palmer from the State. He also found that Alexandra violated the court's order on Peter's visitation. He also stated that the basis for the contempt was that she removed Palmer from the State without leave of court. The judge ordered her into custody to satisfy himself that Palmer would return to Illinois. The judge stated that if he was not satisfied that Alexandra purged herself of the contempt, he would not allow her to continue having custody of Palmer. An order was entered on January 12, 1993, stating that Alexandra was "in wilful contempt of this court's order" and, further, that she was "in contempt for failure to comply with visitation." She was ordered into custody until further order of court and ordered to present Palmer before the court immediately. A hearing was scheduled January 14, 1993.

On January 13, 1993, Alexandra filed a notice of appeal from the contempt order and requested a stay of the order. The next day, this court stayed the contempt order and the order of September 30, 1992, denying her petition to remove.

On January 14, 1993, Peter filed an emergency petition in the trial court requesting temporary custody of Palmer or, in the alternative, extended visitation. The petition was based on Alexandra's previous violations of court orders and Peter's belief that Alexandra might leave with Palmer to Florida. On that day, Palmer was present in court. The judge entered an order allowing Peter to have visitation with Peter until further order of court continuing until January 20, 1993, when the judge was to consider further visitation for Peter.

On January 15, 1993, Alexandra filed a notice of appeal from the January 14 order. That order was stayed by this court pending appeal.

OPINION

I

On appeal, Alexandra first argues that the trial court's denial of her petition to remove Palmer from Illinois to Florida was against the manifest weight of the evidence.

Petitions to remove a child from Illinois are governed by section 609(a) of the Illinois Marriage and Dissolution of Marriage Act, which provides, in part:

> "The court may grant leave, before or after judgment, to any party having custody of any minor child or children to remove such child or children from Illinois whenever such approval is in the best interests of such child or children. The burden of proving that such removal is in the best interests of such child or children is on the party seeking the removal." (750 ILCS 5/609(a) (West 1992).)

When considering a petition to remove a child from the jurisdiction under section 609, the paramount question is whether removal is in the child's best interest and that determination is dependent on the facts of each case. (*In re Marriage of Eckert* (1988), 119 Ill. 2d 316, 518 N.E.2d 1041.) The supreme court in *Eckert* stated: "[b]ecause of the children's interest in maintaining significant contact with both parents following the divorce, it has been held that the mere desire of the custodial parent to move to another State, without more, is insufficient to show that the move would be in the children's best interest." *Eckert*, 119 Ill. 2d at 325, 518 N.E.2d at 1044.

The court in *Eckert* enumerated several factors which a trial court should consider on a removal petition: the likelihood the proposed move would enhance the quality of life for the custodial parent and child; the motives of the custodial parent in requesting the move to determine whether the move is "merely a ruse intended to defeat or frustrate visitation" (*Eckert*, 119 Ill. 2d at 327, 518 N.E.2d at 1045); the motives of the noncustodial parent in resisting the move; and the visitation rights of the noncustodial parent. Also, the court must consider whether a realistic and reasonable visitation schedule can be reached if the removal is granted. Reasonable visitation is one that will preserve and foster the child's relationship with the noncustodial parent. This decision is determined in part on the extent to which the noncustodial parent has exercised his

visitation rights. If the noncustodial parent has diligently exercised his rights, then the court should not interfere with those rights for frivolous, unpersuasive, or inadequate reasons; however, if the noncustodial parent has not exercised his rights, the custodial parent should be free to move if it is in the child's best interests.

A reviewing court should not reverse a trial court's ruling on a petition to remove a child unless it was clearly against the manifest weight of the evidence and it appears that an injustice has occurred. *Eckert*, 119 Ill. 2d 316, 518 N.E.2d 1041.

In the present case, this court must consider the factors of *Eckert* in reviewing whether the trial judge's ruling was against the manifest weight of the evidence. As to whether the move to Florida would enhance the quality of life for Alexandra and Palmer, the evidence showed that the move benefitted Alexandra because of her marriage to a Florida resident, and it benefitted Alexandra and Palmer because Engler supported them. If they were required to move back to Illinois, Engler's salary would be reduced by $5,000 or they may be required to support two households, which Engler testified he could not afford. Alexandra's employment situation would not be different in either State because she was not working due to medical problems. Palmer testified that he liked Florida and did not want to live in Chicago; however, the trial judge found that this testimony was programmed.

There was testimony that the move from Florida back to Chicago would affect Palmer in a negative way; however, this testimony cannot be given much weight because Alexandra created this situation by moving Palmer to Florida without leave of court in May 1991. This allowed Alexandra to accumulate a year and a half of time in Florida in an attempt to bolster her petition for removal. Although Palmer would have to adjust to a move back to Chicago, there was nothing in the testimony to show that the adjustment would be so difficult that, on that basis alone, they should be allowed to remain in Florida.

The testimony of the psychiatrists did not significantly assist one side over the other. Psychological testimony is generally acceptable to ascertain the best interests of the child, but it is not dispositive of the issue. (*Eckert*, 119 Ill. 2d 316, 518 N.E.2d 1041.) In this case, Dr. Littner testified that Palmer was suffering from separation anxiety while Dr. Elkun disputed that finding. Dr. Littner testified that Peter was opposing the removal due to anger toward Alexandra while Dr. Elkun testified that living in Florida would have a detrimental effect on Palmer. This testimony was not dispositive of whether it was in Palmer's best interest to move to Florida.

Alexandra's motives in requesting removal were primarily

motivated by the fact that her husband was a resident of Florida, who had family there. However, it is troubling that there was no attempt to obtain a transfer of Engler's assignment to Chicago. A reduction of $5,000 against a salary of $96,000 per year was not so significant to prohibit a move to Chicago. This supports a conclusion that the move may have been intended to frustrate Peter's visitation. Alexandra also had a history of attempting to restrict Peter's visitation with Palmer through court action. She had alleged in her original removal petition that Peter's visits with Palmer should be supervised based in part on her allegation that Peter watched sexually explicit movies in Palmer's presence. These allegations were subsequently dropped without resolution.

Peter's motives in opposing the move were based in part on his desire to maintain a relationship with Palmer and his concern for Palmer living with Engler. The evidence that Engler physically abused his ex-wife and girl friend is disturbing and a valid basis for concern. However, even if they lived in Illinois, this concern would still be present although Peter could monitor the situation more consistently. It is not true, as Alexandra argues in her brief, that Peter testified he only opposed the move because of Engler. Peter actually testified that he did not object to the move because of the neighborhood or Florida, but he objected because he believed Engler was a bad influence, and he would not be able to see Palmer as often if they moved to Florida.

As to Peter's visitation rights, there was evidence that prior to the move he had exercised visitation although there were occasions which he missed. Overall, he consistently exercised his rights.

Since the move to Florida, the visitation schedule has changed and Peter has not been able to see Palmer on a regular basis. Alexandra offered visitation of three weeks in the summer, but visitation during the other months would be only three days. Before the move, Peter was allowed every other weekend and one weekday each week. Obviously, visitation could not be the same after the move to Florida; the move would reduce Peter's visitation significantly during the school year.

Alexandra relies in part on *In re Marriage of Zamarripa-Gesundheit* (1988), 175 Ill. App. 3d 184, 529 N.E.2d 780, to support her position that the removal should have been granted. In *Zamarripa-Gesundheit,* the appellate court reversed an order denying a mother's petition to remove her child to Seattle, Washington. The mother's new husband had always dreamed of living in Seattle and requested a transfer there before they were engaged. The transfer was granted a few months after they were married. Because the new

husband accepted the transfer, he would have lost his job and benefits if he did not move to Seattle. The financial situation and the child's education would be comparable in either city. The appellate court found that the move would benefit the mother because she could be with her new husband and indirectly that would benefit the child. Although the father would not be able to see his child as much as before, the appellate court stated that factor was outweighed by the enhancement of the quality of life for the mother and child. The father's desire to see his child more often was not sufficient to "chain" the mother to Illinois. (*Zamarripa-Gesundheit*, 175 Ill. App. 3d at 190, 529 N.E.2d at 783.) As a result, the appellate court reversed the order denying the removal.

Although *Zamarripa-Gesundheit* supports a finding that a change in the amount of visitation would not be enough to chain a mother to Illinois, the case is distinguishable from the present case. In *Zamarripa-Gesundheit*, the new husband would have lost his job if they were not allowed to move to Seattle. In this case, Engler would not have lost his job if they were required to move to Illinois. Engler would have lost about $5,000 per year from a $96,000-per-year salary, or if he wanted to keep his salary and current position, he would have to travel an extra day at each end of a trip to fly to and from Miami. Additionally, under *Eckert* each removal case must be reviewed on its own facts.

■ A review of the testimony in this case considering the factors in *Eckert* shows that the judge's ruling denying Alexandra's petition to remove was not against the manifest weight of the evidence. Alexandra's employment situation would not be different in either State and their financial situation would not be significantly different if they were not allowed to move to Florida. Although there was some question as to Alexandra's motives in seeking the move, Peter's motives in opposing the move were genuine. Peter had consistently exercised his visitation rights, which would be reduced by a move to Florida. For these reasons, the order denying Alexandra's petition to remove is affirmed.

## II

Alexandra also argues on appeal that the finding of contempt against her and order of imprisonment were an abuse of discretion. Although it is clear from the record that the contempt was indirect because it occurred outside the presence of the trial judge (see *In re Marriage of Betts* (1990), 200 Ill. App. 3d 26, 558 N.E.2d 404), the judge did not specifically state whether he was holding Alexandra in criminal or civil contempt.

Generally, a contempt finding is civil if sanctions are imposed to compel the contemnor to perform a particular act, but the contemnor must have the opportunity to purge himself of the contempt by complying with the relevant court order. (*Betts*, 200 Ill. App. 3d 26, 558 N.E.2d 404.) On the other hand, a contempt finding is criminal if sanctions are imposed to punish past misconduct. (*Betts*, 200 Ill. App. 3d 26, 558 N.E.2d 404.) The test for determining whether contempt is civil or criminal is to consider the dominant purpose for which sanctions were imposed. (*Betts*, 200 Ill. App. 3d 26, 558 N.E.2d 404.) The same conduct may form the basis for both civil and criminal contempt. (*Betts*, 200 Ill. App. 3d 26, 558 N.E.2d 404.) Whether a party is guilty of contempt is a question of fact for the trial judge and a reviewing court will not disturb the finding unless it was against the manifest weight of the evidence or the record reflects an abuse of discretion. *In re Marriage of Logston* (1984), 103 Ill. 2d 266, 469 N.E.2d 167.

In this case, the trial judge stated several reasons for finding Alexandra in contempt which show he was holding Alexandra in both criminal and civil contempt; however, the finding of contempt cannot be supported as either criminal or civil contempt.

■ The trial judge found that Alexandra violated the court's orders when she moved Palmer to Florida and when she did not provide Peter with all the visitation to which he was entitled. This indicates that the judge was holding her in criminal contempt to punish her for past misconduct. However, when the punishment for indirect criminal contempt could be a fine over $500 or a prison sentence of more than six months, the contemnor is entitled to certain procedural protections, such as the right to a jury trial, the right against self-incrimination, and the right to be proven guilty beyond a reasonable doubt. (*Betts*, 200 Ill. App. 3d 26, 558 N.E.2d 404.) Also, a term of imprisonment imposed as a sanction for criminal contempt must be for a definite term. (*Anderson v. St. Mary's Hospital* (1981), 101 Ill. App. 3d 596, 428 N.E.2d 528; see *In re Estate of Shlensky* (1977), 49 Ill. App. 3d 885, 364 N.E.2d 430.) The punishment imposed was improper for criminal contempt because the prison term was not for a specified term. Although an indefinite prison term would be appropriate for civil contempt where the contemnor holds the "keys to his cell" (*Logston*, 103 Ill. 2d at 289, 469 N.E.2d at 177), it is not appropriate as a punishment for criminal contempt. For these reasons, the finding of criminal contempt is reversed.

Another reason the judge cited for holding Alexandra in contempt was to insure that Palmer would return to Illinois and he ordered Alexandra to produce Palmer in court immediately. This indicates that

the contempt was also civil in nature. However, a person held in civil contempt must be given an opportunity to purge himself of the contempt. (*Betts*, 200 Ill. App. 3d 26, 558 N.E.2d 404.) In this case, Alexandra testified that she would return Palmer to Illinois if she was ordered to do so, but the trial judge did not give her an opportunity to purge herself of the contempt by complying with the order. As a result, the finding of civil contempt cannot be sustained.

### III

Alexandra also challenges the trial judge's order entered January 14, 1993, which granted Peter "further visitation pending further order of court." The order was entered after this court stayed the order denying Alexandra's petition to remove and the order holding her in contempt.

Generally, the stay of enforcement of a judgment preserves the status quo pending appeal. (*Gregory v. First National Bank & Trust Co.* (1980), 84 Ill. App. 3d 957, 406 N.E.2d 583.) After a stay order, the trial court loses jurisdiction to enter any order which would change or modify the order appealed or its scope and from entering any order which would interfere with review of the order. *Shapiro v. Shapiro* (1969), 113 Ill. App. 2d 374, 252 N.E.2d 93.

■ In this case, this court stayed the judgment denying Alexandra's petition to remove which required her to move back to Illinois. Preserving the status quo after the stay would have allowed Alexandra to retain custody of Palmer. The trial judge's order, entered after the stay and granting Peter further visitation for an unspecified number of dates, was in effect an attempt to change custody which would have violated the status quo. As a result, the order was a direct violation of the stay and the trial court did not have jurisdiction to enter it.

For the foregoing reasons, the order denying Alexandra's petition to remove is affirmed, the order finding her in contempt of court is reversed, and the order granting Peter unlimited visitation is vacated.

Affirmed in part; reversed in part and vacated in part.

JOHNSON[1] and THEIS, JJ., concur.

---

[1] Justice Johnson concurred in the disposition of this appeal before his retirement.