*In re* MARRIAGE OF SUSAN PRIBBLE, f/k/a Wagenblast, Petitioner-Appellant, and GREG L. WAGENBLAST, Respondent-Appellee.

Fifth District   No. 5—91—0824

Opinion filed January 27, 1993.

Barbara Crowder, of Crowder & Taliana, of Edwardsville, for appellant.

D. Kent Trone, of Edwardsville, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

The residential parent, petitioner, Susan Pribble, formerly known as Susan Wagenblast, petitioned the circuit court of Madison County for leave to remove the parties' three minor children from the State of Illinois to Ames, Iowa. The trial court denied the petition for removal, and petitioner appeals from that judgment. We reverse and remand.

Petitioner and respondent, Greg L. Wagenblast, were married on June 2, 1978. Three children were born of the marriage, Lindsay, born February 6, 1983, Amy, born February 9, 1985, and Molly, born September 6, 1987. The parties' marriage was dissolved on November 9, 1989. On that same date, an agreement was entered whereby petitioner and respondent agreed to joint custody of the children with petitioner being the residential parent and respondent having physical control of the three children as follows:

"A. June 1st to August 15th of each year.

B. Every winter school vacation.

C. Every other weekend, beginning the weekend after the entry of this Order.

D. One evening per week to be agreed upon by the parties.

E. Alternate school holidays including Christmas and Christmas Eve."

When respondent had physical control of the children during the summer months, petitioner was to have physical custody of the children as outlined above. The declaration making petitioner the residential parent was not to be construed as giving her any greater power than respondent in decision making regarding the children's welfare. Both parents were to have equal rights and responsibilities.

On April 12, 1991, petitioner filed a petition for leave to remove the children from Illinois to Ames, Iowa, stating that she had remarried and that her husband, a cardiologist, had relocated to Iowa, that it would be in the best interests of the children for her to be able to move with them to Iowa, and that such a move would not substantially impair their relationship with respondent. Respondent filed a response to petitioner's petition. The matter proceeded to hearing on June 21, 1991.

At the hearing, petitioner testified that she married Dr. Alan Pribble on March 8, 1991. She and Dr. Pribble became acquainted approximately three years earlier when both were employed at St. Anthony's Hospital. They dated for approximately one year prior to their marriage. Dr. Pribble moved to Ames, Iowa, in November 1990, approximately 4½ months prior to his marriage to petitioner. In November 1990, petitioner and the three minor children moved from Bethalto into a home owned by Dr. Pribble in Brighton. The Brighton residence is a three-bedroom brick ranch house with 2½ baths, a finished basement, and a two-car garage. It sits on a 25-acre tract of land. Two of the girls share a bedroom there.

If allowed to move, petitioner testified the girls would attend St. Cecelia's parochial school in Ames, Iowa. If not allowed to move, petitioner testified the children would still attend another school due to their recent move from Bethalto to Brighton to live in Dr. Pribble's home. Petitioner stated Lindsay and Amy would attend either a nonparochial school in Brighton or a parochial school in Alton. Apparently, respondent did not know anything about the change in local schools. Petitioner and respondent are both members of the Catholic Church and both attend Our Lady Queen of Peace Church in Bethalto. The girls have also been raised Catholic. Lindsay attended first and second grades at Our Lady Queen of Peace School and, at the time of the hearing, was planning on attending third grade at the same school. The school is approximately five blocks from respondent's home. Lindsay's progress at school was above average. Amy attended kindergarten at Toddle Town Day Care in Alton, which is approximately eight miles from respondent's home. Amy was going to be in first grade in the fall of 1991. Respondent planned on Amy going to Our Lady Queen of Peace School and had already registered her for the 1991 school year. Molly attended Toddle Town Day Care in Alton.

Lindsay and Amy would be able to attend Our Lady Queen of Peace School even though petitioner now lives in Brighton. Our Lady Queen of Peace School consists of grades one through eight, but plans have been made to add a kindergarten beginning in the 1991-92 school year. There is no tuition, only weekly contributions to the church. The school has one class per grade. Estimates for the first grade class for 1991 were between 24 and 26 children. Amy would be in that class. Estimates for the third grade for 1991-92 were 21 to 22 children. Lindsay would be in the third grade. The school is accredited by the State, and all teachers are certified. There is one teacher per grade, and there are teacher's aides to assist the teachers. The school has volleyball, basketball, and soccer for both boys and girls. The school has computers in the library. Transportation is not offered. The school has a hot lunch program one day per week. The school does not teach foreign languages. The playground is paved and is used for parking for churchgoers on the weekends. There is no fixed equipment on the playground. There is a ball diamond behind the school situated on a grassy lot.

St. Cecelia's School in Ames, Iowa, consists of grades kindergarten through sixth. The school is accredited and all teachers are certified. Tuition is required. St. Cecelia's anticipates that 21 students will be in the first-grade class and 27 will be in the third-

grade class during the 1991-92 school year. Three foreign languages are available as well as computer classes. Computers are in each classroom. St. Cecelia's has a grassy playground with fixed equipment. There are swings, jungle gyms and large tires for the children to climb through. The school has its own transportation system, with buses picking up and taking home the children. By all accounts, the parochial school in Alton, which petitioner stated the children might attend, is comparable to Our Lady Queen of Peace School in Brighton.

Iowa State University is located in Ames. As a result, Ames has several public facilities which Brighton lacks. Petitioner has taken the children to the Ames Library. It has a special juvenile section and a small stage for puppet shows. Brighton has a public library, but it does not have a special juvenile section and is much smaller than the library in Ames.

Dr. Pribble worked in Alton approximately 4½ years before accepting a new position in Ames, Iowa. He is now under a two-year contract, which began on November 15, 1990, at the McFarland Clinic. He has a base income of $150,000 per year and with an incentive clause is expected to earn $250,000 per year. Dr. Pribble is to work from 7:30 or 8 a.m. until 5 or 6 p.m. Monday through Friday. He also works from one-half hour to three hours on Saturday and Sunday. Dr. Pribble has been a cardiologist for approximately 20 years. Before working in Alton, he worked at the Maricopa Medical Center in Phoenix, Arizona, for approximately four years. Prior to that, he was in Honolulu, Hawaii, for approximately three years. Before that, Dr. Pribble was in Seattle, Washington, for approximately 13 years.

Petitioner testified at the hearing that she is employed at DePaul Hospital in St. Louis, Missouri. She leaves for work at approximately 7:30 a.m. on Monday, Wednesday, and Friday and returns home at approximately 6:45 p.m. on those days. On Tuesday and Thursday, she leaves home at approximately 7:30 a.m. and returns between 4 and 5 p.m. If she moves to Ames, Iowa, petitioner has no plans to work outside the home. No day care would be necessary for Molly, but petitioner might enroll Molly in a morning preschool program in order to give her the opportunity to socialize. According to petitioner, she wanted to move to Ames to be with her new husband and form a family unit. Petitioner testified she would bring her daughters back to the Brighton area to visit respondent at least once a month and on all extended holidays. The girls could also stay with respondent over the summer as was previously

agreed. Petitioner wants the girls to have a continuing relationship with their father but believes this can be accomplished from Ames, Iowa. It is approximately 404 miles from Ames to Brighton and takes between 6½ to 8 hours to make the drive between the two cities.

Dr. Pribble corroborated petitioner's testimony. He testified he encourages the girls to have contact with their father and that he and petitioner could assure the court that the girls would be brought back for at least monthly visits and holiday visits with respondent, or even more visits if it was so ordered. Dr. Pribble had already taught the girls how to dial long distance and was willing to pay long distance telephone bills so that the girls could maintain telephone contact with their father. Dr. Pribble explained that he grew up apart from his own father and appreciated the fact that he could visit his father at will. He wants the same thing for his stepdaughters. Dr. Pribble described his relationship with the girls and his desire for them to move to Ames.

Petitioner and Dr. Pribble were in the process of negotiating for the purchase of a home in Ames. The home is a two-store frame house with approximately 4,000 square feet. It has four bedrooms, three baths, a formal dining room, a family dining room, a kitchen, a living room and a family room. It has a basement that is partially furnished and a two-car garage and sits on a five-acre tract of land. It also has an indoor swimming pool and a basketball court. Ames has a population of 46,000 people and Brighton has a population of 6,000.

Respondent testified against removal of the children to Iowa. He lives in Bethalto in the parties' former marital residence. He is a district sales manager for GNB, Inc., in Bridgeton, Missouri, and makes approximately $39,000 per year. He expressed concern that if the children lived in another State, he would lose communication with them, and that he "wouldn't be able to keep in touch with what they do, how they think, how they do in school, their everyday life." Respondent has exercised his visitation regularly, except for the summer of 1989 when he kept the children for only four weeks instead of the scheduled eight weeks. He testified he was unable to keep the girls the allotted time because day care was too expensive and conflicted with his work schedule. He testified that this would not be a problem in the future because he remarried and his new wife would be able to pick up the girls from day care. Respondent married Mary Wagenblast on May 18, 1991. He and Mary dated for approximately one year prior to their marriage. His new

wife had a good relationship with the girls. The girls have several friends in respondent's neighborhood whom they like to play with during the time spent at respondent's home.

There was some testimony on each side complaining about how the children are allowed to go to other homes instead of being with the custodial parent. For example, petitioner complained that the girls were often at the neighbor's instead of with respondent. Respondent, on the other hand, complained that the girls spent too much time at petitioner's mother's home. Most of the children's relatives live in close proximity to Bethalto. Petitioner's mother and father live in Brighton. The children visit petitioner's parents approximately two to three times per week. Respondent's mother and father live in Jerseyville, and the children visit them occasionally. Aunts, uncles and cousins also live in the area, and the children enjoy frequent social gatherings with them.

Amy was interviewed by the court and indicated that she would like to go to Iowa. She gets along well with petitioner's new husband, as well as respondent's new wife. She said she would be "real sad" if she went to Iowa but her sisters stayed behind with their father.

Lindsay said she did not want to go to Iowa because she wants to be able to see her father. She also stated that she did not want to leave Illinois because her best friend and relatives are here and because she did not want to leave her school. Lindsay said that she had not thought about the possibility of remaining in Illinois while her sisters went to Iowa, because her mother had already told her that she would not move to Iowa unless the court allowed the girls to go. Molly was not interviewed by the court.

Petitioner told the court that she would not move the girls without the court's permission. Dr. Pribble stated that he did not know what he would do if petitioner and the girls did not move to Iowa. He did not plan to make any decisions until he knew the outcome of the hearing.

On July 25, 1991, the trial court ruled that it would not be in the children's best interest to be removed from their present environment, and it denied petitioner's petition for leave to remove. On August 23, 1991, petitioner filed a motion for reconsideration, which was also denied.

The issue we are asked to consider is whether the trial court erred in denying the petition for removal. Petitioner contends that she has met her burden of showing that removal of her daughters would be in their best interest and that, by denying her petition,

the trial court created a manifest injustice, unnecessarily chaining her to Illinois. Respondent replies that the trial court did consider the children's best interests. He contends that the trial court's determination is supported by the evidence and is not against the manifest weight of the evidence, nor has the trial court allowed a manifest injustice to occur. We disagree.

Section 609 of the Illinois Marriage and Dissolution of Marriage Act (the Act) provides:

> "§609. Leave to Remove Children. (a) The court may grant leave, before or after judgment, to any party having custody of any minor child or children to remove such child or children from Illinois whenever such approval is in the best interests of such child or children. The burden of proving that such removal is in the best interests of such child or children is on the party seeking the removal. When such removal is permitted, the court may require the party removing such child or children from Illinois to give reasonable security guaranteeing the return of such children." (Ill. Rev. Stat. 1989, ch. 40, par. 609.)

In removal cases, the most important question is whether the move is in the best interests of the child, and the burden of proof of whether the move is in the child's best interests is in the party seeking removal. *Quirin v. Quirin* (1977), 50 Ill. App. 3d 785, 365 N.E.2d 226.

The Illinois Supreme Court in *In re Marriage of Eckert* (1988), 119 Ill. 2d 316, 518 N.E.2d 1041, found that there was no bright-line test for determining what was in the children's best interests; instead, our supreme court found that removal depends on the facts and circumstances of each case. (119 Ill. 2d at 326, 518 N.E.2d at 1045.) To assist trial courts in determining whether removal is in the children's best interests, the *Eckert* court suggested consideration of the following factors: (1) the likelihood that the move will enhance the quality of life and general welfare of both the custodial parent and the children; (2) the custodial parent's motive in seeking removal—is it legitimate or merely a ruse intended to defeat or frustrate visitation; (3) the motives of the noncustodial parent in resisting removal; (4) whether a realistic and reasonable visitation schedule can be reached if removal is allowed; and (5) if the move is to a distant jurisdiction, the harm to the child which may result by the move. (119 Ill. 2d at 326-28, 518 N.E.2d at 1045-46.) The *Eckert* court went on to note that "[a] trial court's determination of what is in the best interests of the child should not be reversed un-

less it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred." 119 Ill. 2d at 328, 518 N.E.2d at 1046.

The present case is refreshing in that no question has been raised that the motive of either parent is anything other than honorable. Both parents are concerned and conscientious parents. But we believe the evidence presented shows that the move is likely to enhance the general quality of life of the children as well as their mother. For example, Ames is a university town with much to offer in terms of culture. The town has museums and special juvenile programs at the library. The school that the girls would attend in Ames has an outstanding curriculum, covering a wide variety of subjects. Computers are available in every classroom, the playgrounds are grassy with several pieces of fixed equipment, and transportation is available to and from school. Moreover, both petitioner and her new husband testified that if the children were allowed to be removed to Ames, petitioner would not work outside the home; thus, there would be no need for day care, except preschool for Molly.

While at first blush it might appear that moving 404 miles to Ames would mean that the children would lose the benefit of their father's guidance, upon closer scrutiny we find that this need not be the case. Petitioner's new husband, Dr. Pribble, was not raised in the same home as his father but very much appreciated the fact that he was able to maintain close contact with his father. Dr. Pribble has the means necessary to ensure that his stepchildren maintain close contact with their father. He assured the court that he would be willing to pay for long distance telephone calls so that the children could talk frequently with their father back in Illinois.

We believe realistic and reasonable visitation is possible in this case. Ames, Iowa, is 404 miles from respondent's home in Illinois, not 4,004. At least one weekend visit per month is possible. Petitioner was also willing to bring the girls home for long holiday weekends. Respondent would be allowed to have the girls from June 1 to August 15. He is now remarried and his new wife, Mary, would be able to pick up the girls from day care, thus allowing him to take full advantage of his summer visitation. Both petitioner and Dr. Pribble seem sincere in their desire to make sure the girls have a continuing relationship with their father, and both seem willing to do whatever is necessary to ensure this.

We believe the instant case is similar to *In re Marriage of Zamarripa-Gesundheit* (1988), 175 Ill. App. 3d 184, 529 N.E.2d 780,

although the distance between Illinois and the area where the custodial parent desired to move was much greater in *Zamarripa-Gesundheit*. In that case, the custodial mother wanted to remove the children to Seattle, Washington, where her new husband had been transferred. The mother had located a school in Seattle comparable to that attended by the child in Chicago. She had also found a suitable synagogue and pediatrician. She believed her prospects for finding comparable employment in Seattle were also good. The mother agreed to allow the noncustodial father liberal visitation, including weekly telephone calls at the mother's expense. Although the father was allowed liberal visitation with the child while in Chicago and was extremely involved in the child's life, the *Zamarripa-Gesundheit* court reversed the trial court and held that the best interests of the custodial parent and child supported granting the removal petition. The court stated that the move to Seattle would greatly enhance the quality of life for the custodial mother and, therefore, indirectly, the quality of life for the child. (See also *In re Marriage of Carlson* (1991), 216 Ill. App. 3d 1077, 1081-82, 576 N.E.2d 578, 580-81 (where it was noted that the mother's improved quality of life in a successful marriage relationship indirectly benefits the children).) The *Zamarripa-Gesundheit* court also found that although the noncustodial father's visitation rights would change against his wishes, the liberal visitation proposed by the mother would provide the noncustodial father the opportunity to foster his relationship to the child. Specifically, the court there stated:

> "On balance, we do not think that the interests of the custodial mother should be subordinated to those of the noncustodial father. *** Although [the father] would prefer consistent day-to-day contact with [the child], this preference is insufficient to chain [the mother] to the State of Illinois." *Zamarripa-Gesundheit*, 175 Ill. App. 3d at 190, 529 N.E.2d at 783.

Here, we believe petitioner met her burden of showing that removal would be in the best interests of the children. This is not to say there are no detriments caused by such a move. We realize the children will move away not only from respondent but also from other relatives who have played major roles in their lives. The girls will have to adjust to a new school and a new neighborhood and make new friends. However, on the whole, we believe the move would be in the children's best interests. Even the trial court seemed to recognize that petitioner had met her burden. After hearing the motion to reconsider, the trial court stated:

"If all the facts were fed into the computer it would probably come out that the move should be allowed, but the Court has to consider other factors other than just the facts that you would tend to feed into a computer."

The trial court went on to list Lindsay's unwillingness to move and respondent's deprivation of time spent with his daughters as the major factors for denying petitioner's petition. We disagree with the trial court that these two factors are enough to justify denying the petition. We believe Lindsay's unwillingness to move is natural at her age but is not sufficient to deny justifying petitioner's petition, especially in light of the fact that at least one other child was excited about such a move. Moreover, as previously explained in *Zamarripa-Gesundheit*, the noncustodial parent's preference for consistent day-to-day contact is insufficient to keep the mother in Illinois.

We believe the trial court's denial of the petition for removal is against the manifest weight of the evidence, and it appears to us that a manifest injustice has occurred.

For the foregoing reasons, the judgment of the circuit court of Madison County is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion, specifically to grant the petition for removal and establish a new visitation schedule allowing respondent as liberal visitation as possible under the circumstances.

Reversed and remanded with directions.

WELCH, J., concurs.

PRESIDING JUSTICE CHAPMAN, dissenting:

Even though the majority's result might be the one I would have reached had I been the trial judge, I dissent because my review of the record does not convince me that the trial court's decision was against the manifest weight of the evidence. As the majority indicates, this is a difficult case that is not made easier by the fact that the parties are possessed of pure motives and are sincerely concerned about their children. I disagree with the majority, not because of the result it reaches, but because in reaching that result, it has substituted its weighing of the evidence on the *Eckert* factors for that of the trial court.