In re MARRIAGE OF PATRICIA K. McCOY, Petitioner-Appellee, and ROBERT A. McCOY, Respondent-Appellant.

Fourth District   No. 4—94—0911

Argued April 12, 1995.—Opinion filed April 27, 1995.

G. Edward Murphy (argued), of Reynolds, Murphy & Associates, P.C., of Peoria, for appellant.

Robert M. Travers (argued), of Fellheimer, Travers & Engelman, Ltd., of Pontiac, for appellee.

JUSTICE COOK delivered the opinion of the court:

Respondent Robert Alan McCoy appeals an order granting petitioner Patricia Kay McCoy sole custody of the parties' minor children. Robert contends the trial court abused its discretion in granting Patricia sole custody, because the parties had been successfully operating under an alternate-week custody schedule for more than two years prior to the court's order. Robert also appeals an order requiring him to pay $5,000 of Patricia's attorney fees. Robert contends that this order was in error, because Patricia established neither that she was unable to pay her own fees, nor that he had the ability to pay. We affirm.

Robert and Patricia were married on February 7, 1981, in Pontiac, Illinois, where they continued to reside. Two children were born of the marriage: Sharla Marie (born July 14, 1981) and Andrea Kay (born August 3, 1982). Patricia filed for dissolution of marriage in September 1990. At the time of the filing, Patricia was 29 years old and employed as a secretary for the Livingston County sheriff's office. Robert was 35 and self-employed as a drafter.

The trial court entered a judgment of dissolution of marriage on November 9, 1991, but reserved issues of custody and visitation. From the time the parties separated in August 1990 until Patricia was awarded sole custody, the children spent alternate weeks with each parent. Robert lived in the marital home, while Patricia obtained an apartment a mile distant. The children kept a complete set of clothes at each residence.

On April 2, 1992, Patricia filed a petition for an emergency order of protection, which accompanied battery charges filed against Robert alleging he hit her and shoved her against a car. The trial court granted the emergency order *ex parte*. The order entered prohibited Robert from entering or remaining at Patricia's place of employment or the children's school and enjoined him from having any contact with Patricia. Robert failed to appear at the April 10, 1992, hearing on the emergency order of protection, and the court extended the order's effect until April 10, 1993. After a bench trial held October 23, 1992, Robert was convicted of battery.

Following the battery trial, custody hearings commenced before the same judge. During the four days of hearings, Robert argued that the parties' alternate-week custody schedule should continue, while Patricia requested sole custody of Sharla and Andrea. Robert presented evidence that he had been able to cooperate with Patricia regarding parenting during the past two years and that the children were doing well under the joint-custody arrangement. In contrast, Patricia testified that Robert has a violent temper and that the only time the parties can agree is when she accepts his position. Otherwise, Patricia cannot cope with Robert's anger. Patricia stated that the parties have disagreed over school matters, the hours of telephone contact, sharing the children's clothes and the children's grooming. Patricia also testified that Robert uses marijuana.

On December 30, 1992, the trial court awarded Patricia sole custody of the children. Robert was allowed reasonable, unsupervised visitation upon his submission, and the court's approval, of a plan for screening alcohol or illegal substance use prior to each scheduled visitation. Upon receiving a copy of the custody order, Robert went to the sheriff's office where Patricia was employed, and he stared at her through her office door until the sheriff and several officers asked him to leave. Two days later, Robert attempted suicide.

Robert sought to appeal the restrictions placed on his visitation before the trial court approved a visitation plan. He later moved this court to dismiss the appeal for lack of a final order. (See *In re Marriage of McCoy* (4th Dist. 1993), No. 4—93—0212 (order of dismissal).) Meanwhile, Patricia sought a second emergency order of protection against Robert. In April 1993, the trial court granted first the emergency order and then a plenary order. Robert appealed the plenary order of protection, and this court affirmed. See *In re Marriage of McCoy* (1993), 253 Ill. App. 3d 958, 625 N.E.2d 883.

On November 8, 1993, Patricia filed a petition pursuant to section 508 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/508 (West 1992)), seeking to compel Robert to pay

her attorney fees and court costs. Patricia attested in an affidavit accompanying her petition that she had monthly expenses of approximately $1,303, and a monthly net income of $1,316, excluding Robert's child support payments of $325 a month.

At the March 4, 1994, hearing on the petition, Robert stipulated that Patricia's outstanding fees of $10,000 were reasonable in light of the extensive litigation in this case. However, he argued that Patricia could pay her own fees, while he could not afford to pay both his own and Patricia's legal bills. Patricia testified that in addition to her full-time position as a secretary in the sheriff's office, she worked three part-time jobs. Patricia worked 15 to 20 hours each week for the Livingston County Emergency Telephone System Board, and five hours as a church choir director. In the summer, she worked three hours weekly as a musician in the municipal band. She received her highest rate of pay as a secretary, earning $7.13 per hour. Patricia's adjusted gross income was $19,357 in 1993, and her monthly net income was $1,538, including child support payments. However, Robert was $1,597 in arrears on the date of the hearing. Patricia explained that the net income figure in her affidavit was in error, because she had forgotten to subtract all her taxes.

Patricia stated that her monthly expenses were now $1,590. She explained that several of her expenses had increased since she filed her affidavit. Included in her expenses were payments on a loan she had taken out to pay her attorney fees. In addition to the $10,000 in fees she now owed, Patricia had already paid $2,400. Her credit card debts totalled $1,350. Patricia had nothing of value, other than a 1986 Ford Escort with 93,000 miles on it.

Robert testified that he was working for McCoy Construction Company, where he had been part-owner until 1989 or 1990. He received union scale pay of $25 per hour when performing heavy machinery work; otherwise, he was paid $14 per hour. His gross income for 1993 was $23,233, which included $300 unemployment compensation. After deducting taxes and child support, he had a net income of $1,160 per month. He grossed $20,274 in 1992 and $15,754 in 1989.

Robert stated he no longer worked at home as a drafter, because he could not obtain work. He still owned a computer equipped with drafting software, and he admitted that his health did not preclude him from doing drafting work during slow construction periods. He had an associate's degree in art, and he had some paintings for sale in local galleries.

Robert owed his father approximately $25,000 for money borrowed to pay his attorney fees. Robert had paid an additional $2,000

in fees out of his own resources. He owed $400 in medical expenses. He had no assets other than $200 in a savings account and $7,000 equity in the marital home.

The trial court ordered Robert to pay $5,000 of Patricia's fees. On September 16, 1994, the trial court entered an amended supplemental judgment of dissolution of marriage. This order repeated that Robert was to pay $5,000 in fees, but it modified Robert's visitation rights. He was not to consume or be under the influence of alcohol or illegal substances during visitation periods, but he was no longer required to submit to testing. Robert appeals this final order.

Patricia asserts that the September 16, 1994, order is not appealable, because the parties agreed to its terms. Her assertion is based on the docket entry for that date, which states, "Agreed Supplemental Judgment entered." If Robert had in fact consented to the order and accepted its benefits, we would agree that he could not complain of the order on appeal. However, Robert denies that he agreed to the terms of the order. The order is titled "amended supplemental judgment," not "agreed supplemental judgment," and it indicates that it was approved as to form only. It appears likely that the docket entry was in error. We find that we have jurisdiction.

However, not all issues raised by Robert in his brief are properly before this court. Robert complains that the trial court refused to allow a hearing on his claim that his former attorney overcharged him. The matter is both irrelevant to the present appeal and moot, because Robert and his attorney have reached a settlement. Robert appeals the requirement that he submit to drug testing prior to visitation. This issue is also moot, because he is no longer required to submit to testing. He raises no challenge to the present conditions imposed on his visitation rights.

■ Robert contends the trial court abused its discretion in denying his request for joint custody, because the parties manifested an ability to share parenting responsibilities for more than two years under their informal arrangement. Under section 602.1(b) of the Act, a court shall consider an award of joint custody upon the application of either parent, or upon its own motion. (750 ILCS 5/602.1(b) (West 1992).) Joint custody is defined as "custody determined pursuant to a Joint Parenting Agreement or a Joint Parenting Order." (750 ILCS 5/602.1(b) (West 1992).) No joint-parenting agreement was submitted in the present case.

The Act sets forth the criteria for an award of joint custody:

> "(c) The court may enter an award of joint custody if it determines that joint custody would be in the best interests of the child, taking into account the following:

(1) the ability of the parents to cooperate effectively and consistently with each other towards the best interest of the child;

(2) The residential circumstances of each parent; and

(3) all other factors which may be relevant to the best interest of the child." (750 ILCS 5/602.1(c) (West 1992).)

Section 602.1 of the Act was amended subsequent to the trial court's denial of joint custody. The amended section defines "ability of the parents to cooperate" as "the parents' capacity to substantially comply with a Joint Parenting Order." 750 ILCS 5/602.1(c)(1) (West Supp. 1993).

"Since joint custody requires extensive contact and intensive communication, it cannot work between belligerent parents." (*In re Marriage of Drummond* (1987), 156 Ill. App. 3d 672, 679, 509 N.E.2d 707, 712-13, citing Scott, *Joint Child Custody—An Exception*, 64 Chicago Bar Record 406 (1983).) In *Drummond*, this court noted that joint-custody orders are usually unworkable and should rarely be entered. (*Drummond*, 156 Ill. App. 3d at 679, 509 N.E.2d at 713, citing *In re Marriage of Manuele* (1982), 107 Ill. App. 3d 1090, 1094, 438 N.E.2d 691, 694.) We have found that it was an abuse of discretion to award joint custody where the parties repeatedly exhibited hostility, including physical confrontations, and were unable to cooperate in matters involving their child. *In re Marriage of Bush* (1989), 191 Ill. App. 3d 249, 263, 547 N.E.2d 590, 598.

■ Here, the trial court did not abuse its discretion in denying joint custody. Although Robert testified that he was able to cooperate with Patricia, she contradicted this testimony. She presented evidence that Robert was quick-tempered, violent, depressive, and "cooperated" only when he got his way. By the time of the custody hearing, Patricia had obtained her first emergency order of protection against Robert. The trial court was in the best position to hear and evaluate the evidence. We cannot say it erred in weighing the evidence, especially considering Robert's destructive behavior after he learned of the custody award.

■ Robert next contends the trial court erred in ordering him to pay $5,000 of Patricia's attorney fees. "Attorney fees are the primary obligation of the party for whom the services are rendered." (*In re Marriage of Sparagowski* (1992), 232 Ill. App. 3d 257, 258, 596 N.E.2d 210, 211.) However, section 508(a) of the Act provides that a court, after due consideration of the financial resources of the parties, may order one spouse to pay the reasonable attorney fees of the other. (750 ILCS 5/508(a) (West 1992).) Dissolution of marriage cases should not be decided by the fact that one party has better access to funds and legal help than the other. "The allowance of attorney fees in a

dissolution case and the proportion to be paid by each party are within the trial court's discretion and will not be disturbed on appeal absent an abuse of that discretion." *In re Marriage of Phillips* (1993), 244 Ill. App. 3d 577, 596, 615 N.E.2d 1165, 1179.

■ Although section 508(a) of the Act simply requires the court to consider the parties' resources, the propriety of an award of attorney fees is said to be dependent "upon a showing by the party seeking them of an inability to pay and a demonstration of the ability of the other spouse to do so." (*In re Marriage of Bussey* (1985), 108 Ill. 2d 286, 299-300, 483 N.E.2d 1229, 1235.) In contrast, a court need not consider the financial resources of the parties, when awarding fees incurred enforcing an order or judgment, "when the court finds that the failure to comply with the order or judgment was without cause or justification" (750 ILCS 5/508(b) (West 1992)). Patricia has not argued that her fees were incurred because of Robert's unjustified failure to comply with a court order, and the trial court made no such finding. Therefore, we analyze the issue under section 508(a) of the Act, not section 508(b), and consider the parties' financial resources. 750 ILCS 5/508(a), (b) (West 1992).

■ Patricia has demonstrated an inability to pay her fees. At the time of the hearing, she was working several jobs, but her monthly expenses still exceeded her monthly income. Robert argues that she showed a (small) surplus income in her financial affidavit. However, Patricia explained that her affidavit was not accurate. Even if Patricia's present income does exceed her present expenses, she does not necessarily have an ability to pay. "Financial inability exists where requiring payment of fees would strip a party of means of support or undermine financial stability." *In re Marriage of Booth* (1993), 255 Ill. App. 3d 707, 712-13, 627 N.E.2d 1142, 1146.

Robert contends that he is unable to pay Patricia's fees without his financial stability being undermined. We disagree. Robert, with his modest income, is probably unable to pay $5,000 all at once. However, under section 508(a) of the Act, a trial court may order a party to pay attorney fees even when that party lacks present ability to pay. Ability to pay under section 508(a) is different from ability to pay for purposes of civil contempt cases, where a party generally cannot be punished unless he has a present ability to comply with a previous order. See, *e.g., In re Marriage of Betts* (1988), 172 Ill. App. 3d 742, 748, 526 N.E.2d 1138, 1142 (ex-husband could be required to pay ex-wife's attorney fees to avoid contempt-related jail sentence, because ex-husband had present ability to pay).

Few can afford the expense of divorce without incurring debt, which must be paid by someone. A party who does not have the pres-

ent ability to pay his own attorney fees can nevertheless be ordered to pay his own attorney, although enforcement might have to be accomplished by an installment order. Section 508(a) of the Act makes no distinction between the party's own fees and those of a spouse, but puts both on an equal footing. In determining which party is better able to assume the debt, the trial court may consider the prospective income of the parties. *Phillips*, 244 Ill. App. 3d at 595, 615 N.E.2d at 1179.

Ability to pay does not mean ability to pay without pain or sacrifice. Patricia has made sacrifices. She works three jobs while caring for her children. Robert works one job and is apparently living at the same standard of living he enjoyed prior to the dissolution. It is often difficult for a trial court to discern the true financial situation of the parties before it from financial statements, especially in cases like the present one, where one party is receiving purported loans from his parents. (See *In re Marriage of Schmidt* (1993), 242 Ill. App. 3d 961, 610 N.E.2d 673 (discussing the difficulty of distinguishing parental loans from gifts).) Here, the trial court was entitled to give weight to Robert's life-style and the fact Robert has litigated this case to the fullest, without any apparent regard to cost. We cannot say the trial court abused its discretion when it found that Robert should pay one-half of Patricia's fees.

For the foregoing reasons, the order of the circuit court of Livingston County is affirmed.

Affirmed.

LUND and GREEN, JJ., concur.