*In re* MARRIAGE OF JAN MARIE KRIVI, Petitioner-Appellee, and JOSEPH CHARLES KRIVI, Respondent-Appellant.

Fifth District   No. 5—93—0593

Opinion filed September 19, 1996.

CHAPMAN, J., concurring in part and dissenting in part.

M. Keith Smith, of Mt. Vernon, for appellant.

Robert E. Shaw, of Mitchell, Neubauer, Shaw & Hanson, P.C., of Mt. Vernon, for appellee.

JUSTICE WELCH delivered the opinion of the court:

The respondent, Joseph C. Krivi, appeals from a judgment of dissolution entered by the circuit court of Jefferson County. Petitioner, Jan M. Krivi, and respondent were married on April 13, 1985. The parties, who resided in Mt. Vernon, Illinois, had two children together. Julia L. Krivi was born July 9, 1987, and Jenna L. Krivi was born November 14, 1988. Respondent is also the father of Justin Krivi, who lived with the parties during the entire time of their marriage. Petitioner is a registered nurse with a certified occupational therapist certificate. Respondent, who holds a bachelor's degree in educational training and development, is employed as an assistant electric superintendent with Illinois Power. On February 16, 1991, petitioner left Mt. Vernon and took Julia and Jenna to Minnesota. Petitioner has remained in Minnesota and is now remarried.

On April 11, 1991, petitioner filed a petition for dissolution of marriage in the circuit court of Jefferson County. On April 6, 1992, the trial court entered an order dissolving the parties' marriage. On April 29, 1993, the trial court entered a final judgment that, *inter alia*, awarded custody of the children to petitioner, approved petitioner's removal of the children to Minnesota, granted respon-

dent visitation rights, awarded petitioner temporary maintenance, ordered respondent to pay child support in the amount of $381.15 every two weeks, and ordered respondent to pay petitioner's attorney fees in the amount of $19,088.19.

On May 24, 1993, the trial court entered two amended qualified domestic relations orders relating to petitioner's interest in respondent's retirement and savings plans. On June 1, 1993, respondent filed a petition to vacate, modify, or reconsider the final judgment and the amended qualified domestic relations orders. On August 2, 1993, the trial court entered an order amending the final judgment with respect to visitation; however, the trial court denied respondent's post-trial motion in all other respects.

Respondent raises the following issues on appeal: (1) whether the trial court erred in approving petitioner's removal of the children to Minnesota; (2) whether the trial court erred with respect to the issues of custody and visitation; (3) whether the trial court erred in ordering respondent to pay $19,088.19 of petitioner's attorney fees; (4) whether the trial court erred in apportioning respondent's pension benefits; and (5) whether the trial court erred in its distribution of marital property.

Because a great deal of evidence and testimony were presented in the trial court, we will set forth only those facts necessary to an understanding of this court's decision. Relevant facts will be discussed in the analysis of the issues to which they are pertinent.

## I. REMOVAL OF THE CHILDREN TO MINNESOTA

"With the increased number of parents who are divorced and the increasing mobility of society, divorced or legally separated custodial parents frequently seek to move out of the jurisdiction that granted the divorce to another jurisdiction." H. Gitlin, Gitlin On Divorce § 12.00, at 265 (1995).

Illinois law provides that a court may allow a child to be removed from the State of Illinois when such removal is in the best interest of the child. 750 ILCS 5/609(a) (West 1992); *In re Marriage of Young*, 263 Ill. App. 3d 901, 903, 636 N.E.2d 1092, 1094 (1994); *In re Marriage of Branham*, 248 Ill. App. 3d 898, 902, 617 N.E.2d 1317, 1320 (1993). The burden of proving that removal is in the best interest of the child is on the party seeking removal. 750 ILCS 5/609(a) (West 1992); *In re Marriage of Deckard*, 246 Ill. App. 3d 427, 430, 615 N.E.2d 1327, 1330 (1993); *In re Marriage of Davis*, 229 Ill. App. 3d 653, 660, 594 N.E.2d 734, 739 (1992). The Illinois Supreme Court has identified five factors to consider in determining whether removal is in the child's best interest: (1) the likelihood that the proposed move will enhance the general quality of life for both the custodial parent

and the child; (2) the motives of the custodial parent in seeking the move; (3) the motives of the noncustodial parent in resisting the removal; (4) the visitation rights of the noncustodial parent; and (5) whether a realistic and reasonable visitation schedule can be reached if the move is allowed. *In re Marriage of Eckert*, 119 Ill. 2d 316, 326-27, 518 N.E.2d 1041, 1045-46 (1988).

In addition to the factors enumerated in *Eckert*:

"[A] trial court's examination of a removal petition should be guided by the policy of the Illinois Marriage and Dissolution of Marriage Act in custody matters, which states, *inter alia*, that the purpose of the Act is to 'secure the maximum involvement and cooperation of both parents regarding the physical, mental, moral and emotional well-being of the children during and after the litigation.' " *Eckert*, 119 Ill. 2d at 328, 518 N.E.2d at 1046, quoting Ill. Rev. Stat. 1985, ch. 40, par. 102(7) (now 750 ILCS 5/102(7) (West 1992)).

■ A trial court's determination regarding removal should not be reversed unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred. *Eckert*, 119 Ill. 2d at 328, 518 N.E.2d at 1046. Notwithstanding the fact that a trial court has broad discretion in removal cases, that discretion is not unlimited, and when the decision is against the manifest weight of the evidence, it will be reversed. *Davis*, 229 Ill. App. 3d at 660-61, 594 N.E.2d at 739. Our analysis of the *Eckert* factors leads us to conclude that petitioner failed to prove that moving the children to Minnesota, some 850 miles away from their father, was in their best interests. As a result, the trial court's decision granting removal was against the manifest weight of the evidence and must therefore be reversed. To hold otherwise would result in manifest injustice.

We will examine each of the *Eckert* factors in light of the evidence adduced in this case. There is no evidence that the move to Minnesota enhanced the quality of life for petitioner or the children. Petitioner testified that there was not any financial reason for her to leave Mt. Vernon. She did not leave Mt. Vernon for a better job in Minnesota. Petitioner's job in Mt. Vernon was comparable to her present job in Minnesota. Furthermore, petitioner testified that her home in Mt. Vernon was adequate for the children's needs, that the children were "basically" happy in Mt. Vernon, that the children had friends in Mt. Vernon to play with, that there were adequate babysitting arrangements in Mt. Vernon, and that the children could receive adequate care, housing, training, and opportunity in Mt. Vernon.

Petitioner also stated that she would be willing to return to Mt.

Vernon in order to keep custody of the children and that there was nothing to prevent her from moving back to Mt. Vernon. We note that petitioner's move to Minnesota disrupted the children's lives not merely once, but three additional times. Petitioner first lived in Lakeville, Minnesota, from February 18, 1991, until the end of August 1991. Petitioner then lived in Redwood Falls, Minnesota, until June 1993. At present, petitioner and the children live in Franklin, Minnesota.

Regarding the motives of the custodial parent in seeking the move, we note that the mere desire to move to another state, without more, is insufficient to show that the move is in the child's best interest. *Deckard*, 246 Ill. App. 3d at 430, 615 N.E.2d at 1330; *Davis*, 229 Ill. App. 3d at 661, 594 N.E.2d at 739. Courts must remain vigilant to ensure that custodial parents do not "employ removal as a weapon, especially in light of the severe statutory limitations placed upon restriction or termination of visitation." *In re Marriage of Creedon*, 245 Ill. App. 3d 531, 535, 615 N.E.2d 19, 22 (1993). The trial court found that "the children were certainly removed because of the act of violence on the part of Mr. Krivi." Additionally, the trial court found that petitioner removed the children to "separate them from a hostile environment."

We find that the trial court's findings regarding petitioner's motivation for removing the children from their home in Mt. Vernon are against the manifest weight of the evidence. The evidence does show that on September 20, 1990, the parties had a physical altercation which began when petitioner slapped respondent and ended with petitioner having to seek medical treatment for injuries inflicted by respondent's beating. There was no evidence of a pattern of violence or of previous physical altercations between the parties. The parties cohabited without another incident of physical violence for five months after first coming to blows on September 20, 1990. When asked to state her reason for leaving, petitioner, who had recently undergone treatment for her varicose veins, said she left because respondent went on a golf outing without saying goodbye to her or asking how she felt.

Petitioner testified that she relocated to Minnesota because her mother, brother, and sister lived there. However, the mere desire to move to another state, without more, is simply not sufficient to show that the move is in the children's best interest. *Deckard*, 246 Ill. App. 3d at 430, 615 N.E.2d at 1330; *Davis*, 229 Ill. App. 3d at 661, 594 N.E.2d at 739. We note that Justin, who has a close brother-sister relationship with Julia and Jenna, lives in Mt. Vernon. Petitioner's motivation for moving to Minnesota does not weigh in favor of removal.

Insofar as the motives of the noncustodial parent in resisting the removal are concerned, there is no evidence to suggest that respondent's motives are based on anything other than a desire to maintain close contact with his children. There is no evidence in the record to suggest that respondent is anything other than a loving and caring parent who is interested in being a part of his children's lives. The evidence shows that respondent has had an excellent relationship with his children since the separation. During visitation, respondent shows his children love, reads books to them, plays with them, and takes them on camping trips in the motor home. Respondent testified that he wanted the children to stay in Mt. Vernon because:

> "[They] should be where their home is. [Mt. Vernon] is where they were born and *** raised. They have a brother and a family and a home. They have friends. They have *** a home where they had a huge sunroom where they played *** and watched their dog run in the back yard ***."

We can ascribe no improper motives to respondent's opposition to removal. Respondent raises serious and legitimate reasons for resisting removal.

Lastly, we consider the fourth and fifth *Eckert* factors together, *i.e.*, the visitation rights of the noncustodial parent and whether a realistic and reasonable visitation schedule can be reached if the move is allowed. The negative impact that removal of the children to Minnesota, some 850 miles away from Mt. Vernon, has on respondent's visitation rights is great. A child has an interest in maintaining *significant* contact with both parents following a divorce. *Eckert*, 119 Ill. 2d at 325, 518 N.E.2d at 1044. "[I]t is in the best interests of children to have a healthy and close relationship with both parents, as well as with other family members, and thus the visitation rights of the non-custodial parent should be carefully considered." *In re Marriage of Stone*, 201 Ill. App. 3d 238, 243, 559 N.E.2d 92, 95 (1990); see also *In re Marriage of Shalashnow*, 159 Ill. App. 3d 760, 766, 512 N.E.2d 1076, 1079 (1987) (it is self-evident that it is in a child's best interest to have a healthy and close relationship with both parents).

A reasonable visitation schedule is defined as follows:

> "[A] [r]easonable visitation [schedule] is one that will preserve and foster the child's relationship with the noncustodial parent. This decision is determined in part on the extent to which the noncustodial parent has exercised his visitation rights. If the noncustodial parent has diligently exercised his rights, then the court should not interfere with those rights for frivolous, unpersuasive, or inadequate reasons; however, if the noncustodial par-

ent has not exercised his rights, the custodial parent should be free to move if it is in the child's best interests." *In re Marriage of Gibbs*, 268 Ill. App. 3d 962, 968-69, 645 N.E.2d 507, 513 (1994).

Respondent has diligently exercised his visitation rights. In fact, as far as we can determine, respondent has never missed a scheduled visitation opportunity. The biggest impediment to effective visitation in this case is the sheer distance involved. Distance is a proper consideration in determining the feasibility of a visitation schedule. See, *e.g., Branham*, 248 Ill. App. 3d at 900, 904, 617 N.E.2d at 1319, 1322 (reasonable visitation schedule possible where distance involved was 230 miles); *In re Marriage of Pribble*, 239 Ill. App. 3d 761, 768, 607 N.E.2d 349, 354 (1993) (reasonable visitation schedule possible where distance involved was 404 miles).

The trial court awarded respondent the following visitation:

(1) one long weekend in February of each year for winter break;

(2) Memorial Day weekend every year and Labor Day weekend in odd years only;

(3) one long weekend in October of each year for Columbus Day;

(4) the first half of the children's Christmas vacation, including Christmas day, in the odd years and the second half of the children's Christmas vacation, excluding Christmas day, in the even years;

(5) the children's spring vacation and Thanksgiving vacation in even years;

(6) two two-week periods in each summer with 30 days advance notice; and

(7) one additional weekend each month.

The trial court amended its visitation order to require that during the school months, September through May, the exchange for visitation take place at the children's home in Minnesota, with petitioner reimbursing respondent $125 to defray transportation costs. During the months of June, July, and August, the exchange takes place in Iowa City, Iowa, with each parent bearing his or her own transportation costs.

Prior to the entry of the trial court's visitation order, the parties met halfway at a predetermined location to exchange the children. Even when petitioner and respondent met halfway, each party still had to drive 850 miles roundtrip in order to exchange the children. Respondent testified that such a trip, which takes approximately 16 hours, wore the children out. Having to commute 850 miles roundtrip to pick the children up and then another 850 miles roundtrip to drop the children off a few days later cut substantially into respondent's visitation time both in terms of quantity and in terms of quality. For instance, if respondent leaves early on a Friday morning

to pick his children up for a weekend visit, most of Friday is over by the time he gets back to Mt. Vernon. Respondent has only Saturday to spend a full day with his children before he has to travel another 850 miles on Sunday to return them to petitioner.

As demonstrated above, the previsitation-order exchange routine was onerous, unreasonable, and impractical. The trial court's visitation order is even worse because it is completely unworkable. The trial court ordered that during the school months (September through May), respondent must drive all the way to Minnesota and pick the children up. Thus, respondent is required to drive 850 miles to pick the children up in Minnesota, 850 miles to take them to Mt. Vernon, 850 miles to return the children to Minnesota, and 850 miles to return to Mt. Vernon. Traveling 3,400 miles makes a weekend visit in Mt. Vernon an impossibility. It takes four 16-hour days to travel 3,400 miles.

Even if respondent only visited his children in Minnesota, he would still be required to drive 1,700 miles, which would take two 16-hour days. Respondent would also have to incur the cost of renting a motel room, or other suitable space, to visit with his children. Under the trial court's visitation schedule, most of the visitation time respondent has with his children is spent traveling in a car. Such an arrangement is neither good for the children, who must endure lengthy commutes, nor good for respondent. The net result of the trial court's visitation schedule is to deny respondent any meaningful contact with his children.

Having carefully considered all five *Eckert* factors in light of the evidence adduced in this case, we conclude that petitioner completely failed to meet her burden of showing that removal of the children from the State of Illinois would be in the children's best interests. Consequently, the trial court's removal decision was against the manifest weight of the evidence. To hold otherwise would result in a manifest injustice. We therefore reverse the trial court's removal decision, and pursuant to Supreme Court Rule 366(a)(5) (134 Ill. 2d R. 366(a)(5)), we direct that the children be returned to the State of Illinois.

## II. CUSTODY AND VISITATION

■ In light of our decision regarding removal, the trial court on remand is directed to reconsider the issues of custody and visitation.

## III. ATTORNEY FEES

"Few can afford the expense of divorce without incurring debt, which must be paid by someone." *In re Marriage of McCoy*, 272 Ill. App. 3d 125, 131, 650 N.E.2d 3, 7 (1995).

■ As a general rule, attorney fees are the primary responsibility of the party for whom the services are rendered. *In re Marriage of Walters*, 238 Ill. App. 3d 1086, 1100, 604 N.E.2d 432, 443 (1992); *In re Marriage of Mantei*, 222 Ill. App. 3d 933, 941, 583 N.E.2d 1192, 1197 (1991). However, section 508(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) allows a trial court, after considering the financial resources of the parties, to order either spouse to pay the reasonable attorney fees and costs of the other spouse. 750 ILCS 5/508(a) (West 1992); *In re Marriage of Hassiepen*, 269 Ill. App. 3d 559, 569, 646 N.E.2d 1348, 1356 (1995); *Walters*, 238 Ill. App. 3d at 1100, 604 N.E.2d at 443. The allocation of assets and liabilities, maintenance, and the relative earning abilities of the parties should be considered when determining an award of attorney fees. *In re Marriage of Carr*, 221 Ill. App. 3d 609, 612, 582 N.E.2d 752, 754 (1991).

A party seeking attorney fees must show two things: (1) an inability to pay and (2) the ability of the other spouse to pay. *In re Marriage of Bussey*, 108 Ill. 2d 286, 299-300, 483 N.E.2d 1229, 1235 (1985); *Hassiepen*, 269 Ill. App. 3d at 569, 646 N.E.2d at 1356. The burden of proof is on the party seeking the attorney fees to show that the fees incurred were reasonable and necessary. *In re Marriage of Drone*, 217 Ill. App. 3d 758, 769, 577 N.E.2d 926, 933 (1991); *In re Marriage of Douglas*, 195 Ill. App. 3d 1053, 1060, 552 N.E.2d 1346, 1351 (1990). A trial court's award of attorney fees will not be disturbed on review absent an abuse of discretion. *Bussey*, 108 Ill. 2d at 299, 483 N.E.2d at 1235; *Carr*, 221 Ill. App. 3d at 611, 582 N.E.2d at 753.

■ The trial court ordered respondent to pay $19,088.19 of petitioner's $27,175.92 in attorney fees and costs based upon the fact that respondent had a more secure and better paying job and because petitioner was unable to meet her current basic expenses. For the reasons set forth below, we find that the trial court abused its discretion in awarding petitioner attorney fees.

## A. PETITIONER'S INABILITY TO PAY

Financial inability exists where payment would undermine the economic stability of the spouse incurring the debt. *In re Marriage of Orlando*, 218 Ill. App. 3d 312, 323, 577 N.E.2d 1334, 1343 (1991); *In re Marriage of McGory*, 185 Ill. App. 3d 517, 522, 541 N.E.2d 801, 804 (1989). In 1991, petitioner grossed $20,476.72 and netted $15,246.47, giving petitioner a monthly net income of $1,270.54. In her financial affidavit, petitioner listed a monthly gross income of $1,800 (based upon her working 120 hours per month at $15 per hour) and a monthly net income of $1,440 after deductions. We note that if petitioner worked 160 hours per month at $15 an hour, petitioner

would gross $2,400 per month and $28,800 per year. As of March 8, 1992, petitioner had grossed $4,016.25 and netted $2,848.94 over the course of 10 weeks, which translates to $1,139.56 net income per month. Petitioner worked an average of 26.78 hours per week for the first 10 weeks of 1992.

Depending on the figures used, petitioner's yearly net income, including child support in the amount of $9,909.84 per year from respondent, ranges from a low of $23,584.56 to a high of over $30,000. For instance, using petitioner's actual earning figures for the first 10 weeks of 1992 and projecting them over the entire year, petitioner would net $23,584.56 ($13,674.72 pay plus $9,909.84 child support). But if petitioner's actual 1991 earning figures are used, petitioner would net $25,156.31 ($15,246.47 pay plus $9,909.84 child support). Using the figures from petitioner's financial affidavit ($15 an hour and a 30-hour work week), petitioner would net $27,189.84 ($17,280 pay and $9,909.84 child support). Finally, we note that petitioner would net in excess of $30,000 per year in pay and child support if she worked a regular 40-hour work week ($28,800 gross pay and $9,909.84 child support).

Petitioner's financial affidavit shows the following monthly living expenses:

| | |
|---|---:|
| Mortgage | $ 300 |
| House Insurance | 15 |
| Tax Escrow | 23 |
| Food | 225 |
| Medical | 215 |
| Gas, Oil & Maintenance | 70 |
| Utilities | |
| Gas | 50 |
| Electricity | 80 |
| Telephone | 100 |
| Health Insurance | 144 |
| Dental Insurance | 33 |
| Clothes | 100 |
| Credit Cards | |
| Master Card | 50 |
| Wards | 50 |
| Babysitter | 200 |
| Miscellaneous | 40 |
| Total | $1,695 |

The evidence does not support the trial court's finding that

petitioner was unable to meet her living expenses. Although petitioner may not have a lot of extra money left over after paying her living expenses, especially if petitioner's projected 1992 income figures are used, we do not believe that she has demonstrated an inability to pay her own attorney fees, nor do we believe that her economic stability would be undermined if she had to pay the attorney fees. The ability to pay does not mean the ability to pay without pain or sacrifice. *McCoy*, 272 Ill. App. 3d at 132, 650 N.E.2d at 7. More importantly, we believe that petitioner's claimed inability to pay her attorney fees is self-imposed. The evidence shows that petitioner had worked an average of only 26.78 hours per week for the first 10 weeks of 1992. Petitioner could increase her hours or obtain a part-time job in order to generate additional income. See *In re Marriage of Phillips*, 244 Ill. App. 3d 577, 595, 615 N.E.2d 1165, 1179 (1993) (court may consider a party's prospective income, as well as his or her current income, in awarding attorney fees); see also *In re Marriage of Kennedy*, 214 Ill. App. 3d 849, 862, 573 N.E.2d 1357, 1365 (1991) (where wife was already working full-time and husband was not, trial court did not abuse its discretion in awarding wife attorney fees because, *inter alia*, husband had the ability to increase his income by working a regular 40-hour work week). We note that petitioner's March 8, 1992, pay stub indicates that she worked 37.75 hours that week, which shows that petitioner can work more than 26.78 hours per week. If petitioner were to work a 40-hour work week, she could pay her own attorney fees without undermining her economic stability. In any event, we conclude that petitioner failed to prove an inability to pay her own attorney fees.

## B. RESPONDENT'S ABILITY TO PAY

At the outset, we note that petitioner calculates respondent's net income by using the statutory formula set forth in section 505(a)(3) of the Act (750 ILCS 5/505(a)(3) (West 1992)) for determining net income for purposes of child support payments. As such, petitioner does not deduct certain "voluntary" contributions (*e.g.*, 401(k) plan, group life, and credit union payments) from respondent's gross pay. We reject this method of calculating net income in determining respondent's ability to pay attorney fees. Nothing in section 508(a) directs a court to use the net income formula contained in section 505(a)(3). Nor does petitioner cite a case to support her position that section 505(a)(3) should be used in determining net income for purposes of awarding attorney fees. In fact, there are cases where the courts have indeed deducted so-called "voluntary" nondeductible contributions from a party's gross pay in order to arrive at a net income

figure. See, *e.g., In re Marriage of Florence*, 260 Ill. App. 3d 116, 125, 632 N.E.2d 681, 688 (1994) (deductions from party's gross pay included payments for deferred compensation, credit union savings, and retirement).

Petitioner relies a great deal upon the fact that respondent earns more money than she does. While this is true, respondent has greater expenses. According to respondent's support affidavit filed on March 23, 1992, respondent's gross income is $56,100 per year and $4,675 per month while his net income is $28,176 per year and $2,348 per month. Respondent has the following monthly expenses:

| | |
|---|---|
| Mortgage | $ 784 |
| House Insurance | 35 |
| Tax Escrow | 120 |
| Food | 400 |
| Medical | 40 |
| Auto Maintenance | 70 |
| Utilities | 310 |
| Life Insurance | 92 |
| Health Insurance | 55 |
| Auto Insurance | 55 |
| Clothing | 117 |
| School Expenses | 147 |
| Vacation Club | 110 |
| Total | $2,335 |

As is evident, respondent can barely cover his monthly expenses of $2,335 with his monthly net income of $2,348. Even if respondent were not to include the vacation club and school expenses, he would still be almost unable to meet his monthly expenses. Supposing even further respondent managed to cut his monthly expenses of $2,335 by 20% ($467) or 30% ($700.50), respondent must still pay child support in the amount of $825.82 per month. Assuming that respondent's monthly expenses are $2,078, excluding the vacation club and school expenses, and assuming that respondent somehow managed to cut his expenses by 30% ($623.40), respondent would have monthly expenses of $1,454.60. Add to this $825.82 in child support, and respondent's monthly expenses would total $2,280.42. Subtracting this hypothetical monthly expense figure from respondent's monthly net income of $2,348 would leave him with $67.58 with which to pay not only petitioner's attorney fees but his own. This court is unable to see how respondent, despite his greater earning capacity, could possibly pay the bulk of petitioner's attorney fees and continue to pay his own monthly expenses and attorney fees.

Petitioner erroneously states that respondent has assets of $101,250, excluding the value of an antique trunk. The evidence shows that respondent listed the following assets in an amended financial affidavit filed April 9, 1992:

| | |
|---|---|
| Residence | $ 77,000 |
| 1991 Toyota Camry | 9,975 |
| 1988 Dodge Grand Caravan | 9,775 |
| 1976 Midas Motor Home | 2,800 |
| Washer | 250 |
| Stereo | 400 |
| Camcorder | 600 |
| Scuba Gear | 200 |
| Bank Accounts | 250 |
| Total | $101,250 |

First, there is a $42,000 mortgage owed on the former marital residence, and petitioner was awarded a $10,000 lien on the home as her share of equity in the marital home. Second, petitioner was awarded both the Dodge Grand Caravan and the Midas Motor Home. As a result, respondent actually has $36,675 in assets, none of which, other than the $250 in bank accounts, is in liquid form.

Petitioner asserts that respondent's "monthly cash flow could be substantially improved by again refinancing the $42,000 mortgage balance." Because respondent has virtually no liquid assets and little money left over each month after paying his expenses, respondent would either have to refinance his home, take out a loan, or sell off assets he needs, like his car and household appliances, in order to pay off $19,088.19 in attorney fees. Inflicting financial ruin on the party being asked to pay the attorney fees is no more appropriate than requiring the fee-seeking spouse to suffer financial ruin.

## C. CONCLUSION

Cases like the instant case are always the most difficult to resolve because the evidence shows that neither party is in strong financial condition. Petitioner has failed to show her inability to pay and respondent's ability to pay. This case could also be fairly characterized as one in which the financial circumstances of both parties are substantially similar in that neither party is particularly able to pay attorney fees. Where the financial circumstances of both parties are substantially similar, an award of attorney fees may be an abuse of discretion. *In re Marriage of Passiales*, 144 Ill. App. 3d 629, 639, 494 N.E.2d 541, 549 (1986); *In re Marriage of Moriarty*, 132 Ill. App. 3d 895, 900, 478 N.E.2d 537, 540 (1985). Additionally, given that neither party's estate should be exhausted nor his or her economic stability

undermined (*Mantei*, 222 Ill. App. 3d at 941, 583 N.E.2d at 1198), we reverse the trial court, and pursuant to Rule 366(a)(5), we order that each party pay his or her own attorney fees in this case.

For the aforementioned reasons, we hereby affirm in part, reverse in part, modify in part, and vacate in part the trial court's rulings; we enter orders; and we remand this cause with directions.

Affirmed in part; reversed in part, modified in part, and vacated in part; orders entered; and remanded with directions.

MAAG, J., concurs.

JUSTICE CHAPMAN, concurring in part and dissenting in part:

I respectfully disagree with my colleagues' disposition of the first issue. I would affirm the trial court's ruling on the removal of the children to Minnesota. Although I do not approve of the wife's removal of the children without the benefit of a court order, I do not feel that the trial court's decision was against the manifest weight of the evidence. Therefore, I dissent as to the majority's ruling on the first issue only.